In the Interest of R.E.C., M.E.D. & M.B.C., Plaintiffs.

JUVENILE OFFICER, Respondent,

v.

D.L.D., Natural Mother, Appellant.

No. WD 37910.

Missouri Court of Appeals, Western District.

Sept. 16, 1986.

Thomas C. Capps, Liberty, for appellant.

Max Von Erdmannsdorff, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and MAN-FORD and GAITAN, JJ.

MANFORD, Judge.

This is a direct appeal from a judgment terminating parental rights pursuant to § 211.447, RSMo Supp.1985.[1] The judgment is affirmed.

These proceedings commenced by the simultaneous filing of three petitions for termination of parental rights. Each petition sought termination against the natural father separately on the basis of abandonment. In addition, each petition sought termination against the natural father and the natural mother on the basis of neglect.[2]

The petitions alleged that the natural parents had neglected said children, for a period in excess of six months prior to the filing of the petitions for termination, by failing to provide, on a continuing basis, "the care, guidance and control necessary for the physical, mental and educational well-being" of said children. In addition, the petitions alleged that the natural parents, during the period the children were in the custody of the Missouri Division of Family Services, failed to provide for the children to the extent that they were financially able, and failed to communicate with

1. Said proceedings are within and pursuant to § 211.447, RSMo Supp.1985 because the petition herein was filed on September 10, 1985. The effective date of the amendment to § 211.-447 was July 19, 1985.

2. The natural father was never located and service of process was had upon him by publication. He has never participated in these proceedings and no appeal has been presented on his behalf.

and visit with said children. The petitions further alleged that although the parents were notified of an approved and appropriate court plan, they continued their neglect and abandonment of the children. The petitions also alleged that efforts of communication and visitation were "token efforts and [were] superficial in nature," and that the parents had failed, on a continuing basis, to rectify the conditions and that termination would be in the best interests of the children.

Jurisdiction over the children by the juvenile court was secured pursuant to § 211.-031.1(1)(a), RSMo Supp.1984 and § 211.181, RSMo Supp.1984 by an order of the juvenile court. The children remained out of the custody of the parents for more than six months and under the jurisdiction of the juvenile court for more than a year.

A hearing was conducted on December 19, 1985. In addition to testimony received at this hearing, the investigative social report, the report of the guardian ad litem, statement of income and expenses, photos of the mother's residence, reports of social workers, and other documents were admitted without objection. The following is the factual account from these various evidentiary sources:

It is apparent from the record that the natural parents have been known to the Missouri Division of Family Services since 1979 through various assistance programs for themselves and the children. In 1980, a Hot-Line report for child abuse was investigated, but was unsubstantiated. On September 11, 1981, another Hot-Line report was investigated. This time, it was learned that neither parent was employed, and they, along with two of the children, were living in a residence not their own. The residence was described as filthy and the children were infested with head lice. A protective services program was started and services provided until January 21, 1982. It was then learned that they had temporarily moved to Texas. They returned to Missouri, and on December 14, 1982, another Hot-Line report was received, this time alleging physical abuse and physical neglect of the children. Services were again provided. Although the natural mother was urged to update immunizations for the children, to enroll one of the children in Headstart, and to participate herself in programs, she was not receptive and was of the opinion that such things were not important. On October 26, 1983, another Hot-Line report was received and investigated. This time it was observed that the children were dirty and smelled of urine. Bruises were observed on two of the children. The residence was cluttered and dirty. The natural mother had been borrowing food from neighbors, and the children were not being fed properly. While it was claimed that the natural mother was selling the supplied food stamps for gasoline money and marijuana, these claims were not substantiated. Relatives of the natural father sought to take the children under the foster care program. The children were then placed, by the natural parents, with the maternal grandparents. Investigation determined that the maternal grandfather was suffering from serious health problems and the grandparents could not care for the children. On June 13, 1984, the children were taken into protective custody by the Excelsior Springs Police Department. An investigation had determined that on June 11, 1984, the natural mother left the children with the grandparents but without any provision for support and without any communication or visitation. Both parents whereabouts were unknown, but it was later determined that the natural mother had accompanied her boyfriend to Phoenix, Arizona.[3]

After the children were made wards of the court, the court found that the residence of the children was in a filthy condition in that trash was lying in easy access to the children, windows were broken out, holes were in the walls and ceiling, knives were stuck in the ceiling, clothing was strung throughout the house, animal feces

---

**3.** Apparently, the boyfriend went to Arizona out of fear after being shot at by unknown persons who suspected that the boyfriend was a narcotics officer.

were found throughout the house, the house was infested with bugs and the smell of urine existed throughout the house. In addition, it was found that the children, on numerous occasions, were found unattended and in filthy condition with matted hair. Also, there was a foul odor in the street or yard. The court also found that the natural mother, in the presence of the children, used what the court believed to be illegal drugs.

Other evidence also disclosed that in a period of thirteen months, the mother had lived at more than nine different locations. She had indicated to employees of the Division of Family Services that she was "moving from shelter to shelter." In this same period of time, the natural mother paid only $30.00 toward the support of her children.

A statement of parental rights was provided the natural mother, which she signed on September 7, 1984. It had been previously stamped by the juvenile court under the date of August 15, 1984. This document informed her of her visitation, her rights, and the circumstances which caused the court to exercise its jurisdiction over the children. It also included the agreement of the mother to contribute $20.00 per month support for the children. She also agreed to participate in a drug counseling program, to remain free of drugs, to attend parenting classes, and to demonstrate her ability to financially provide for the children and to provide them with a clean and stable environment.

The record reveals that the natural mother did not, for over a year after the children were taken from her custody, seek drug screening, and did not obtain screening until the petitions for termination were filed. These tests did establish that she was drug free, although she had admitted to the occasional use of marijuana.

The evidence reveals that the children have adjusted to their foster care family. The natural mother has also given birth to another child, and the natural father of that child is the boyfriend.

In October, 1985, the natural mother was residing in a residence in Wyandotte County, Kansas. An investigation was launched, due to a Hot-Line report. The investigation revealed "horrible conditions at the Armstrong address." The mother was urged to move and was given an ultimatum to do so or to possibly face the loss of her infant daughter [4] fathered by the boyfriend. The mother did move and obtained an improved housing condition. At the time of the hearing, the boyfriend and father of the infant female, although married to another woman, spent several nights at the mother's residence.

As to the mother's visitation with the three children, the record shows no visitation from December 3, 1984, until March 7, 1985. Although several visits were scheduled, they were cancelled by the mother. The plan called for monthly visits. From March 7, 1985, to November 18, 1985, the mother kept eight of the nine visitations. She explained that she did not keep the November 18, 1985 visit due to automobile difficulties.

The record discloses no regular employment or any concerted effort for same by either the mother or the boyfriend. It appears that the only source of income was a $300.00 monthly Aid to Dependent Children payment.

The guardian ad litem filed her report and the report was made a part of the record herein. In the report, the guardian concluded, "I witnessed no evidence of bonding and/or affection in an interchange I observed at the end of a visit between Ms. D. and her three children. Ms. D. has made only what seems to be token attempts to regain custody of her children and only then under the threat of termination of her parental rights." This report recommended termination.

The record disclosed that the natural mother graduated from high school. Her employment record included a brief job with the Whitaker Cable Corporation (ter-

---

4. It should be noted that this female infant is not involved in the present proceedings.

minated due to pregnancy), the United Handicapped (terminated because of lack of sales), and Midwest Hanger Company. The employment with Midwest was from June 3, 1978, until November 18, 1978, and was terminated because her foreman did not like her, therefore, she quit.

While the mother professed a love for the children and sought their return, she admitted that she had no money to provide for the children. She stated that if she could not secure more A.D.C., she would obviously "have to find a job." Any other facts applicable herein will be found within the disposition of this appeal, *infra*.

The evidence closed. Upon findings of fact and conclusions of law, the juvenile court terminated the parental rights of both parents. This appeal followed.

While formally a simple, sole point is presented by appellant, said point is really bifurcated and charges that the trial court erred (1) by ordering the termination of the parental rights of the natural mother, because (1) the allegations of neglect, abandonment, and failure to rectify existing conditions were not proven by clear, cogent, and convincing evidence, and (2) the court considered grounds not alleged in the petition to be reasons for termination.

Appellant's argument in support of her first point addresses four specific reasons why the court erred. These are taken up and disposed of separately herein.

Appellant first asserts, "[W]ith regard to the petition in the present case, the first ground presented for termination is that the natural mother has neglected said child for a period of six months prior to [the] filing [of the] petition while the child was in the custody of the Missouri Division of Family Services." [5] She asserts that the court judgment found neglect upon (1) inadequate communication; (2) inadequate visitation; and (3) failure to provide for the child (see note below) to the extent she was financially able. She points to the evidence which shows that under the court plan, she

was allowed one visit per month and she made those visits for eight of nine months. She stated that she was unable to keep the last visitation. From this, she concludes that she communicated and visited the children every time (except the visit in November) she was permitted, and thus there was not clear, cogent, and convincing evidence of her failure to communicate and visit.

First, it is noted that neither the petitions for termination nor the judgment findings prescribe the time period as only six months prior to the filing of the petitions. Indeed, both the petitions and the judgment entry address a period "in excess of six months prior to the filing ..." Appellant overlooks evidence which described the lack of bonding between appellant and the children, even after her visits. There is no evidence of any other communication or any attempt at any other communication, except for the regularly scheduled visits. In addition, the evidence revealed that from December 3, 1984, until March 7, 1985, although visits were scheduled, appellant cancelled them and did not visit the children. Further, upon observation of appellant's efforts, the guardian ad litem reported that appellant "made only token attempts to regain custody of her children and then only upon threat of termination of her parental rights."

While appellant did, as the record reveals, visit her children some eight times in nine months, there is no evidence that she offered any other communication, nor did she employ any real effort to increase the visitation. It was obvious that the visitations were failing to develop any real bond of affection between appellant and her children. Appellant's assertion that there was not clear, cogent, and convincing evidence of inadequate visitation and communication is without merit in light of the record before this court.

Secondly, it is asserted by appellant, with regard to her failure to provide finan-

---

**5.** For purposes of clarification, it should be noted that while both parties alternatively refer to the child or the children, these proceedings involve three petitions and three children, the matter having been consolidated by the juvenile court.

cial support, that the record shows she gave $30.00 support in some thirteen months. She further asserts that during said time, her income was from A.D.C. for a monthly amount of $300.00. She states that when her income and living expenses are reviewed, the $30.00 is all she was capable of providing. Appellant overlooks evidence that she was a high school graduate. There is no evidence that she was incapable of employment. Indeed, the record shows that she quit one job because "her foreman did not like her." The agreement entered into by appellant vested in her the responsibility to provide $20.00 per month financial support as a demonstration of her ability and her willingness to provide for her children. The record shows that she made no such effort. Appellant's assertion that there was no clear, cogent, and convincing evidence of her failure to provide the children with support to the extent she was financially able is without merit.

Thirdly, appellant asserts that there never was a court approved plan as required by § 211.447. Appellant states, "The only evidence on the plan is a stamp which reads, 'Reviewed By Judge, August 15, 1984.'" From that statement, appellant argues that just because it was reviewed, does not mean it was approved and cites to this court, *In the Interest of D.L.H.*, 660 S.W.2d 471 (Mo.App.1983).

■ In the first instance, the mere stamp by the court referred to above *is not* the only evidence upon the record. The record reveals testimony by the juvenile officer, *without objection* that the plan was approved by the court. In addition, when offered as evidence, the plan, as an exhibit, was admitted without objection. Further, the record is quite clear that all the parties herein treated the plan as applicable. During oral argument when asked, appellant stated that approval of the plan was not the real issue, but rather, that appellant had substantially complied therewith. It would be unconscionable to permit either party at this stage of the proceedings and under the particular facts and circumstances herein to challenge the ap-

proval of the plan simply because there is no direct proof offered that the juvenile court formally entered an order or made some formal entry that the plan was approved. To be sure, it makes for a more clear record for the courts of appeal if the juvenile court would enter a formal order upon its records approving a plan, and this is the preferred action which should be taken. On the other hand, each case must be viewed upon its own facts and circumstances to determine this question. Appellant's reliance upon *D.L.H.* is misdirected because *D.L.H.* is clearly distinguishable on its facts. There are present in this case facts and circumstances not present in *D.L.H.*, thus rendering that case as not applicable and certainly not controlling.

Appellant further asserts that even though the plan be considered as approved, the resondent's evidence that she failed to comply with the plan failed, as discussed and for the reasons set forth in her arguments above. As observed, this court has concluded that there was no merit to the two previous reasons and it thus follows that appellant's third contention is meritless.

■ In her fourth assertion, appellant states that there was not sufficient evidence to establish abandonment because a finding of abandonment must show and require a finding that a parent has foregone all parental rights. She further asserts there was no evidence that she did forego her parental rights for six months prior to the filing of the petition for termination of parental rights. She likens this case to *In the Interest of W.F.J.*, 648 S.W.2d 210 (Mo.App.1983). She relies upon *W.F.J.* for the proposal that "separation itself and placement of the child in a foster home constitute no proof of abandonment, ..." *W.F.J.* at 215. What appellant fails to mention in regard to her reliance upon *W.F.J.* is that the case rules that while mere separation is not a ground or evidence of abandonment, the juvenile court should consider "numerous other factors" in its determination if abandonment has occurred. In the present case, the record

reveals a "mere token" effort by appellant. The record is clear on appellant's failure to rectify the living accommodations. The record is quite clear that until the lapse of almost one year, she did not seek drug screening. The record is quite clear that she contributed only $30.00 toward the support of the children. The record is quite clear that independent of and separate from the mere separations of appellant and her children, the evidence supports a finding by the juvenile court of abandonment. Appellant's point (1) is without merit and is thus ruled against appellant.

Under her final argument which addresses point (2) above, appellant asserts the petition alleged that the children had been under the jurisdiction of the juvenile court for over a year and that appellant had failed to rectify the conditions asserted for the acquiring of jurisdiction by the juvenile court. Appellant argues that the allegations in the petitions, to wit, failure to provide on a continuing basis the care, guidance and control necessary for the physical, mental, and educational well-being of these children, merely track the statute for purposes of seeking termination. She further contends that the petitions do not specifically allege the grounds for termination. Appellant overlooks additional language in the petitions, which alleges:

> [S]uch failure to provide for said child [children] while in the custody of the Missouri Division of Family Services has consisted of inadequate communication and visitation and failure to provide for said child [children] to the extent that they have been financially able. That there has been an appropriate Court approved plan presented to the natural mother regarding her parental rights and duties and although duly notified thereof, abandonment and neglect herein has continued. Any efforts at communication and visitation have been token efforts and are superficial in nature.

■ Thus, appellant's contention that the petitions for termination do not assert or allege the grounds for termination other than the mere language of the statute simply is not supported with and by a reading of the petitions.

Appellant concedes that the evidence established that she had nine residences, consisting of several houses and shelters, but she contends there was no evidence of the living conditions of these locations when she lived with her children. That assertion is simply not supported by the record. As noted above, these children came to the attention of the authorities via the Hot-Line and upon investigation, it was revealed that the children were dirty and smelled of urine. The investigation also observed that their residence was dirty, cluttered, and animal feces were found throughout the residence. The children were found to be unattended on numerous occasions in the street or in the yard with filthy and matted hair. After a lapse of several months (during which appellant had the nine separate residences) she was located in Kansas City, Kansas. At that time she was living with her infant daughter (fathered by the boyfriend and not a party herein) in a deplorable condition. The conditions were so bad that she was advised to move under threat that she might lose her infant daughter in a separate proceeding. After appellant was threatened or advised to move, she did so and her next residence was a decided improvement over her previous residence. The point appellant overlooks is that the residential conditions which contributed to the removal of her children in the first place were not corrected or improved until several months later. The record further reveals that only after threat, suggestion, and/or advice to do so did appellant seek and secure improved housing. In addition, during this same interim period, there was no attempt by appellant to seek drug screening, but that took place subsequent to the filing of the petition to terminate.

■ Upon the whole of the evidence herein, it must be concluded that conditions which gave rise to the court initially acquiring jurisdiction continued to exist. There was a court plan to which appellant agreed. The plan was not complied with

and the evidence supports a finding that the conditions would not be rectified. Thus, the record simply fails to support appellant's contention that the juvenile court based the termination upon grounds not alleged in the petition. There is no merit to appellant's final contention and point (2) is ruled against appellant.

Judgment affirmed.

All concur.