**In the Interest of R.H.S., and J.L.S., Juveniles.**

**Thomas D. CARVER, Juvenile Officer, Respondent,**

v.

**R.E.S., Natural Father, Appellant.**

**No. WD 38851.**

Missouri Court of Appeals, Western District.

Aug. 18, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 29, 1987.

Mary Murphy, Kansas City, for appellant.

Audrey J. Bimby, Kansas City, for respondent.

Before CLARK, P.J., and NUGENT and LOWENSTEIN, JJ.

NUGENT, Judge.

Defendant R.E.S. seeks reversal of the trial court's judgment terminating his parental rights as to his young sons, R.H.S. and J.L.S. Defendant claims that § 211.-447.2(3),[1] the recent enactment setting out the grounds for termination of parental rights, is unconstitutionally vague and, as applied in this case, violated his right to due process guaranteed by the Fourteenth Amendment to the United States Constitution. In addition to those constitutional challenges, defendant claims that the juvenile officer failed to establish a statutory ground for termination by clear, convincing and cogent evidence and that the trial court failed to set out in its order certain findings required by § 211.477.5 and § 211.447.3.

We find that the defendant has not preserved the constitutional questions for appellate review and that his other arguments do not compel reversal, and we affirm the judgment of the trial court.

In 1980, the defendant married a woman who had two daughters born out of wedlock. He never adopted those children. Two sons were born of the marriage, and they are the subjects of this appeal: R.H.S., born December 3, 1980, and J.L.S., born May 28, 1982.

On December 1, 1982, when the couple and all four children were living together in Kansas City, the defendant's wife called the Missouri Division of Family Services (DFS) hotline. The juvenile officer promptly filed petitions under § 211.031, R.S.Mo. 1978, alleging that the mother could not protect the boys as the father "is physically abusive to the mother and [her two daughters]," and "the mother fears future physical abuse." As a result of a detention hearing on December 3, 1982, DFS assumed custody of all four children for placement in foster care.

At a hearing in February, 1983, both parents, through their appointed counsel, admitted the allegations of the petitions filed on behalf of R.H.S. and J.L.S. In its order of February 8, 1983, the juvenile court granted sole custody of the boys to their mother under the supervision of DFS, although the parents lived together as husband and wife. The court also ordered that both parents continue counseling they had begun with a psychologist, not to be terminated without the court's consent, and that both parents attend "parenting" classes.

On about March 7, 1983, the parents took the children from Missouri without informing DFS and without the court's consent. Because of the "parents' failure to cooperate," the juvenile court issued an order to take the children into judicial custody.

On October 5, 1983, Commissioner Kierst modified his order of February 8 thereby committing R.H.S. and J.L.S. to the custody of DFS for placement in foster care, terminating his original order, and ordering that a treatment plan be submitted for court approval. The defendant appeared in person at the October 5, 1983, hearing without an attorney present. On October 27, 1983, he signed a treatment plan designed by his social worker. That plan was never approved by the juvenile court. Later, the parties signed a second plan developed by Glen Schowengert, another social worker, and Commissioner Kierst approved it on May 15, 1984.

In August, 1985, Commissioner Kierst ordered the juvenile officer to pursue a termination of defendant's parental rights. At the September, 1986, hearing, Mr. Schowengert, Leslie Brown and Terry Johnson—three social workers who had been assigned to the defendant's case at various times—collectively testified that the approved treatment plan addressed six areas of concern: (1) that defendant maintain a stable residence; (2) that defendant maintain stable employment and send child support when financially able to do so; (3) that defendant "attend counseling" and "get his anger under control;" (4) that defendant visit the children regularly and send them letters and gifts; (5) that defendant undergo a chemical dependency screening test; and (6) that defendant resolve his "legal difficulties" and "issues." At the time of the hearing, the defendant was serving a ten-year sentence in an Ala-

---

1. All sectional references are to Revised Statutes of Missouri, 1986, unless otherwise indicated.

bama prison. Two of the social workers felt that the fact that the defendant would not have an opportunity for parole until at least January of 1989 created another obstacle to reuniting the defendant and his sons.

The three social workers testified about the potentially harmful conditions—most of which the treatment plan identified—that continued to impede the defendant's reunification with his sons. Mr. Schowengert, who was assigned to the defendant's case in 1983 and 1984, had referred the defendant to a vocational rehabilitation program to help him obtain stable employment. After about a month, however, the program expelled the defendant for "verbal abuse and explosiveness on the jobsite." The defendant attended counseling for a three-month period before he was extradited to Florida to face criminal charges for check forgery. The defendant called the social worker from Florida but never gave a forwarding address. He told Mr. Schowengert that he was working for a construction company but never disclosed his earnings. He sent no child support during that period or at any time.[2] Upon his return to Missouri in March, defendant telephoned Mr. Schowengert sporadically. When the social worker repeatedly referred him to the DFS "parenting" classes, the defendant would become hostile and refuse. At one point, he told Mr. Schowengert that he was attending "parenting" classes at the Salvation Army. However, when Mr. Schowengert called to verify, the Salvation Army explained that they did not offer such classes.

From December, 1983, to February, 1984, the defendant occupied three residences, then his whereabouts became unknown to DFS. When he returned to Missouri, he would not reveal his address. Eventually he went back to Florida and later to Alabama, again leaving no address.

DFS was never able to substantiate the claims that the defendant abused alcohol or drugs and that was the reason Mr. Schowengert requested a screening test. The defendant, however, repeatedly refused to be screened for chemical dependencies.

Nor had DFS been able to substantiate reports that defendant had physically abused his children or that his alleged "anger control problem" had ever transferred to a problem with his children. However, Mr. Schowengert's testimony reveals many incidents where the defendant became angry, cursed and yelled when the social worker attempted to refer him to various counseling programs and also reveals that the defendant harassed the boys' foster parents.

Mr. Schowengert acknowledged the existence of a bond between the defendant and R.H.S., his elder son, but did not recall that R.H.S. ever cried or became upset after a visit from his father. He noted that the defendant was always adamant in stating his desire to regain custody of the boys.

In November, 1984, Leslie Brown became the defendant's social service worker. She testified that during that year, she arranged only one visit between the defendant and his sons. For the visit to occur, the defendant was to surrender himself to his probation officer. He never called back to confirm the arrangements for the visit. Ms. Brown could not schedule other visits because she had no way to contact the defendant.

When Ms. Brown first took the case, the defendant maintained sporadic telephone contact with the boys, calling them at their foster homes. DFS discontinued that arrangement at the foster parents' request because the defendant made threats toward them and promised the children toys and gifts that, apparently, he never sent. Once, Ms. Brown had to change the foster placement of J.L.S. and his half-sister be-

2. The defendant made reference to his employment by a construction firm in his application for a continuance in a proceeding set for April 11, 1984. There, he stated that he hoped to save enough money to establish a suitable residence in Jackson County, Missouri, in order to satisfy the DFS treatment plan. He also stated that he desired additional time to establish his ability to "stabilize his living situation and support his children." At the termination hearing, the court took judicial notice of defendant's reference to that job.

cause of the defendant's threats to the foster parents.

In February or March of 1985, the defendant informed Ms. Brown that he was going to Alabama. Once there, he contacted a social service worker in Anniston, who in turn contacted Ms. Brown. Ms. Brown sent a new treatment plan to the defendant for his signature and a copy to the case worker. The defendant refused to sign the new plan. Ms. Brown learned from the social service worker that the defendant had been arrested in Alabama. She next heard from the defendant in August, 1985, when he was in an Alabama prison.

During her year as case worker, Ms. Brown never saw the defendant and his sons interact. However, she was aware that R.H.S. was very fond of his father and spoke of him often. She acknowledged that the defendant occasionally sent cards and letters to the children. At one point, she sought, but did not obtain, permission to refrain from reading certain letters to them because the letters "made promises to the children that were not logical and that they would be together soon and this type of thing."

At that point, the court admitted the juvenile officer's Exhibits 1 and 2 into evidence, a certified copy of the defendant's conviction in Missouri of stealing a motor vehicle and a certified document from the Alabama Department of Corrections confirming defendant's sentence of imprisonment for ten years for theft and receiving stolen property.

Terry Johnson, the current social worker who took the defendant's case in November, 1985, testified that the defendant had been in prison in Alabama the entire time she had the case except for one week in August, 1985, when she did not know where he was. Ms. Johnson stated that the defendant had not visited the children since 1984, and although he maintained contact by telephone and letters while she had the case, that contact ceased in July, 1986. She felt that defendant's present incarceration and the prospect of parole not sooner than January, 1989, aggravated the problem created by defendant's sporadic contact with his children.

Ms. Johnson acknowledged that DFS records showed that the defendant had visited his children on eleven days between December 31, 1982, and January 31, 1983, before they were returned to their mother's custody. She also agreed that the defendant visited the children nineteen times in the five and one-half months between August 3, 1983, and January 18, 1983, when he was extradited to Florida. For one month of that time, the defendant did not have a social worker. Ms. Johnson further testified that the defendant had made at least six calls to his children from November 14, 1984, to January 10, 1985, and had sent letters and cards or made calls to his children nineteen times between August 3, 1985, and mid-July, 1986. While she had the case, the defendant maintained bi-monthly contacts with the children, and once had sent a wallet to each boy.

Ms. Johnson testified that the defendant had not yet "completed" counseling, including "parenting classes" and a program designed to help him control his anger. She and the defendant entered into a written service agreement outlining the types of programs he could attend through the prison system. At one point, he signed a release permitting Ms. Johnson to obtain information about his social service activities while in prison. She learned that as well as attending weekly counseling sessions while in prison the defendant had read some child development books and had completed a forty-hour personal development course. Prison evaluators said that the defendant was making strides in controlling his anger in that his "acting out behavior" had decreased. But in July, 1986, he refused to renew the release and his contact with Ms. Johnson abruptly ceased.

The defendant had had earlier periods of counseling—from December, 1982, to February, 1983, and again from October, 1983, to January, 1984. Ms. Johnson did not feel, however, that the defendant had "completed" those programs in that the counselors did not recommend that he dis-

continue counseling. The defendant had twice been the subject of psychological studies, and had at one time attended and completed budgeting classes. Despite the assessments from the prison social service worker that he had made significant improvements in counseling there, Ms. Johnson maintained that the defendant had not met the counseling requirement set forth in the treatment plan.

The DFS records contained comments by professionals and others indicating the existence of a bond between the defendant and his oldest son, R.H.S. The most recent was a letter of May, 1986, from a psychologist, Dr. Wubbenhorst, indicating that R.H.S. wished to live with his father. Ms. Johnson admitted that R.H.S. remembered his father but, from her observations of R.H.S. she did not feel that the bond was particularly strong.

She testified that the defendant wrote to her to request that two home studies be done—one of Marilyn McMann, a former foster parent to all four children, and one of the defendant's mother who resides in Virginia—to determine whether either home could be approved for adoption or for foster placement until the defendant and his children could be reunited. As Marilyn McMann's "was a closed foster home," Ms. Johnson could not do a study. However, she initiated a study of defendant's mother's home and received a recommendation from a Virginia social service worker who had a favorable impression of the home. Despite the limited resources, the grandparents offered "alot of love." The Virginia case worker recommended that the two boys have a preplacement visit with their grandparents "if adoption should occur."

When all four of the children interacted, Ms. Johnson had observed signs of bonding. One of defendant's stepdaughters had voiced her desire to be adopted together with her sister and her half-brothers. To investigate the possibility that all four siblings could be adopted together, Ms. Johnson published the children's profiles in the adoption exchange directory and entered their names into the computerized adoption referral service. A computer search revealed that at least 185 families in Missouri would be willing to adopt a group of four siblings. Ms. Johnson also received six calls from families interested in adopting the four children.

She gave her opinion that terminating the rights of all the children's parents was in the children's best interest so that they could be placed together in a stable, adoptive home.

Marilyn McMann testified on behalf of the defendant. She had been a foster parent to R.H.S. and one of his half-sisters for about two years and had all four children in her care for about two months until DFS closed her foster home and removed all of the children due to an unrelated incident. According to Ms. McMann, the defendant had a warm relationship with all four children and particularly with R.H.S. She stated that the defendant made at least twelve visits to the children while she was foster parent and that he often called them. She believed that the defendant, given the proper assistance, could establish a stable home for the boys.

Defendant testified by telephone in his own behalf. He admitted to having a criminal record and to being in prison. He stated his intent to preserve the parent-child relationship and voiced his wish that his mother could have custody of the two boys until his parole—possibly in January, 1989—because he loved them very much. Then, the defendant recounted the activities he had undertaken in prison in an effort to become a better parent.

On October 9, 1986, the trial court entered separate but virtually identical orders terminating defendant's parental rights as to R.H.S. and J.L.S.[3]

## I.

The defendant argues that the trial court's orders terminating his parental

3. The orders also terminated the mother's parental right as to R.H.S. and J.L.S. on the ground of abandonment. The mother was served by publication. She did not appear at the hearing.

rights on the basis of § 211.447.2(3) cannot stand because that section is unconstitutionally vague, in contravention of the Fourteenth Amendment. Specifically, the defendant charges that the second clause of § 211.447.2(3), allowing severance of parent's rights where "conditions of a potentially harmful nature continue to exist," fails to notify a parent of what conditions he must rectify to retain his parental rights. That language appears for the first time in the 1985 amendments to the statute and has never been passed upon by the Missouri Supreme Court. The defendant questions whether it can serve as the sole basis for terminating his rights as to R.H.S. and J.L.S.

To emphasize the notice defect with respect to that basis for terminating parental rights, the defendant points to the notice provisions of the other bases for termination contained in the statute: The elements of abandonment are meticulously set forth in subsection (1). Likewise, the factors constituting abuse or neglect are detailed in subsection (2). Finally, the alternative basis for termination under subsection (3) allowing termination when "the conditions which led to the assumption of jurisdiction still persist," clearly presents no notice problem.

The defendant concedes that the "harmful conditions" proscribed in this case were, arguably, his failure to comply with the social service agreement he entered into with DFS, his volitional criminal activities and his resulting imprisonment, and the fact that DFS has been unable to aid him on a continuing basis in adjusting his circumstances or conduct to provide a proper home for his sons. Nevertheless, he claims that from the face of the statute one cannot tell whether that is the conduct proscribed. He further claims that the statute, as applied here, deprived him of procedural due process when it allowed the termination of his parental rights "based solely on his failure to comply with the terms of a social service agreement."

 The defendant presents serious constitutional issues, but he has not preserved those challenges for our review. Constitutional questions must be raised at the first opportunity consistent with orderly procedure. *White v. State*, 430 S.W.2d 144, 148 (Mo.1968). In the present case, the defendant was personally served with the petitions on November 22, 1985. Those petitions cite § 211.447 and track the language of subsection 2(3), reciting jurisdictional facts and stating that conditions of a potentially harmful nature continue to exist that are not likely to be remedied at an early date so that the children can be returned to the parents in the near future. The defendant's first opportunity to raise the constitutional issues would have been through responsive pleadings, but he filed no such pleadings. Similarly, the defendant could have raised those questions a number of times throughout the proceedings. Notably, he did not move to dismiss the petitions at the start of trial. Although he moved to dismiss at the close of the juvenile officer's evidence, he did not raise the constitutional issues at that time. In fact, he did not inject the constitutional issues until after a full trial had taken place and judgment had been entered, when he moved to set aside the trial court's orders terminating his parental rights.

The Missouri Supreme Court and the appellate courts of this state have repeatedly rejected consideration of a constitutional question when raised for the first time in a motion for rehearing, *White, supra,* at 148; in a motion for new trial, *J.B.B. v. Baby Girl S,* 611 S.W.2d 359, 361 (Mo.App.1980); in closing argument to the trial judge, *Christiansen v. Fulton State Hospital,* 536 S.W.2d 159 (Mo.1976) (en banc); or for the first time on appeal, *In re J___ Y___,* 637 S.W.2d 670, 673 (Mo.1982) (en banc), *In Re Adoption of T.E.B.R.,* 664 S.W.2d 609, 612 (Mo.App.1984). *Cf. Hanch v. K.F.C. National Management Corp.,* 615 S.W.2d 28, 33 (Mo.1981) (en banc) (because the appellant claimed "an infringement upon the jealously protected right of free speech," the Supreme Court considered his constitutional challenges under the plain error rule despite the fact that they were raised for the first time on appeal).

In view of the defendant's failure to preserve the constitutional questions for review, we have no jurisdiction to transfer the case to the Missouri Supreme Court, which has exclusive appellate jurisdiction in all cases involving the validity of a statute of this state. Art. V, § 3 of the Missouri Constitution.

## II.

Defendant argues that the juvenile officer relied on § 211.447.2(3) and subparagraphs (a) and (b) but failed to establish by clear, convincing and cogent evidence a statutory ground for termination of defendant's parental rights. Those statutory sections provide as follows:

2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

. . . .

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division

or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child. . . .

Specifically, defendant claims that the juvenile officer has not met his burden of proof because he failed to show what "condition of a potentially harmful nature exists." Defendant reiterates his constitutional challenge—not preserved for our review—that the statutory arrangement does not identify what conditions he must rectify to retain his rights and does not make clear whether "the failure to make any progress in complying with the terms of a social service plan can be an independent basis for terminating a parent's rights (i.e., it is in itself a condition of a 'potentially harmful nature')" or whether it is merely an evidentiary factor the court may consider in determining whether the potentially harmful condition exists or is of a continuing nature.

To this end, defendant argues that the trial court's finding by clear, cogent and convincing evidence that he "failed to comply" with the court-approved service plan does not embody the standard set forth in the new statutory scheme. Although the juvenile officer presented some evidence that he had not complied with some of the terms of the social service agreement, that evidence was not sufficient to show that defendant had made no progress at all in complying with the treatment plan. He says that the proper inquiry is whether he made *any* progress in complying with the terms of the social service agreement. He then lists as evidence of "some progress" the efforts he had made toward compliance with the treatment plan, including his participation in the extensive counseling program provided at the prison and his completion of a forty-hour personal development course there.

Finally, defendant claims that, given evidence of the emotional bond he shares with R.H.S., the availability of the paternal grandmother's home for the long-term placement and the clear statutory option

provided by § 211.477.4(2),[4] the juvenile officer failed to establish by clear, cogent and convincing evidence that an irreversible termination of the parent-child relationship would be in R.H.S.'s best interests.

We need not decide whether a parent's failure to comply with a social service agreement, standing alone, is sufficient evidence to support termination of that parent's rights over his child. As to both R.H.S. and J.L.S., the court ordered termination of the defendant's parental rights on the ground that "conditions of a potentially harmful nature continue to exist" that are unlikely to be remedied at an early date so that the children can be returned to the parent in the near future. § 211.447.2(3). Those orders demonstrate a consideration of factors other than the extent of defendant's compliance with the court-approved treatment plan.

Notably, the court considered evidence of the defendant's volitional criminal activities, the potentially lengthy prison sentence he is now serving in Alabama and their effect on the parent-child relationships with R.H.S. and J.L.S. While the social service agreement approved on May 15, 1984, recommended that the defendant clear up existing legal difficulties, it could not have envisioned the defendant's 1985 conviction in Alabama. As recently stated by the Missouri Supreme Court, the new statutory language permitting the court to consider "conditions of a potentially harmful nature [that] continue to exist" is an explicit statement that harmful conditions not originally considered could form the basis of the termination. *In re M.E.W.*, 729 S.W.2d 194, 196 (Mo.1987) (en banc); *see also* § 211.-447.3(6), requiring the court to make a finding, when appropriate, that the felony conviction of a parent is of such a nature that the child will be deprived of a stable home for a period of years; "provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights...." *Cf. In re Adoption of M.D.L.*,

682 S.W.2d 886, 889 (Mo.App.1984); *In re Adoption of K.L.G.*, 639 S.W.2d 619, 626 (Mo.App.1982) (The effect of incarceration on termination of parental rights).

■ In making the determination that "conditions of a potentially harmful nature continue to exist," the court also considered evidence that amply supports its finding under § 211.447.2(3)(b), that the DFS has been unsuccessful in aiding the defendant on a continuing basis in adjusting his circumstances or conduct to provide a proper home for his children. As well as the defendant's repeated refusal to inform DFS of his address or phone number, noted in the court's orders, the record reveals countless examples of his general lack of cooperation with caseworkers, including his failure to appear at a child visitation, his harassment of foster parents resulting in complaints to DFS and a change in foster placement for J.L.S. and his half-sister, his refusal to sign a new treatment plan sent to him in Alabama, and his refusal to sign an information release so that Ms. Johnson could continue to learn of his progress from the Alabama prison authorities.

Defendant next seems to say that since the record contains some evidence that he made progress in complying with the terms of the social service plan, the trial court could not have found by clear, cogent and convincing evidence that he failed to comply with or made no progress in complying with the plan.

■ Section 211.447.2(3)(a) requires the court to consider "[t]he terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms" in determining whether to terminate parental rights. Nothing in the statute compels the defendant's conclusion that the court may consider nothing short of a complete failure to comply with the plan as evidence militating toward termination. *Cf. In re B.S.*, 710 S.W.2d 27,

---

**4.** Section 211.477.4 provides various alternatives to termination of parental rights. Of interest here is subsection (2), allowing the court to place the child in the legal custody of the parent, a relative, or another suitable long-term caregiver when the court finds that one or more of the grounds set out in § 211.447 exists but that termination is not in the best interests of the child.

29–30 (Mo.App.1986). There, the Eastern District of this court found sufficient evidence to support the trial court's judgment terminating the parents' rights under a now repealed neglect provision requiring proof that a parent has not "reasonably complied" with the court-approved service agreement. Despite evidence of full compliance with certain terms, the court stated, "Their mere participation in the agreement was not sufficient. Parents must make a commitment to change the course of their conduct which prevents the return of their children." *See also In re R.E.C.,* 716 S.W.2d 879, 885–86 (Mo.App.1986) and *In re R.E.M.,* 712 S.W.2d 398, 400–03 (Mo. App.1986), both discussing a court-approved social service plan in the context of the "failure to rectify" provision of earlier versions of § 211.447.

Moreover, the defendant's interpretation of the requirement of § 211.447.2(3)(a) ignores the trial court's prerogative to determine the credibility of the witness and to accept or reject all, part or none of the testimony. *See In re Adoption of W.B.L.,* 681 S.W.2d 452, 454 (Mo.1984) (en banc). In a termination of parental rights proceeding, the party seeking the termination bears the burden of proof. *C.S. v. Smith,* 483 S.W.2d 790, 794 (Mo.App.1972). The standard of proof is clear, cogent and convincing evidence. § 211.447.2; *see Santosky v. Kramer,* 455 U.S. 745, 747–48, 768–70, 102 S.Ct. 1388, 1391, 1402–03, 71 L.Ed.2d 599 (1982). That standard is met when the evidence "instantly tilt[s] the scales in the affirmative when weighed against the opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Adoption of W.B.L., supra,* 681 S.W.2d at 454, quoting *In re O'Brien,* 600 S.W.2d 695, 697 (Mo. App.1980). "This does not mean that there may not be contrary evidence." *Grissum v. Reesman,* 505 S.W.2d 81, 86 (Mo.1974). When the trial court has received conflicting evidence, appellate courts should review the facts in the light most favorable to the trial court's order. Supreme Court Rule 73.01; *In re M.E.W., supra,* 729 S.W.2d at 196.

■ Accordingly, we hold that clear, cogent and convincing evidence supports the trial court's determination that "conditions of a potentially harmful nature continue to exist." *Cf. In re M.E.W., supra,* 729 S.W.2d at 197 ("If any one ground for termination is supported by the evidence the termination may stand.").

■ Only after a determination that one or more grounds for termination of parental rights exists does the question of the best interests of the child arise. *See* § 211.447.2. *Cf. In re Adoption of M.D.L., supra,* 682 S.W.2d at 880–89. As the defendant points out, a finding of the existence of one or more statutory grounds for termination does not compel severance of a parent's rights. Section 211.477.4(2) allows the court to place the child in suitable long-term care, retaining jurisdiction, if the court finds that continuing the parent-child relationship would be in the best interests of the child. The defendant, therefore, requests that the court preserve his parental rights as to R.H.S. under that provision because of the strong evidence of emotional bonding between the defendant and his oldest son and the availability of suitable placement with the paternal grandmother until the defendant is released from prison.

■ The best interests of a child "is at best a conclusion drawn from the facts and evidence presented." *In re R.E.M., supra,* 712 S.W.2d at 403. *Cf. In re M.E.W., supra,* 729 S.W.2d at 197; *D.G.N. v. S.M.,* 691 S.W.2d 909, 913–14 (Mo.1985) (en banc). The conclusion that termination is in the child's best interests cannot, as a practical matter, be based upon considerations wholly separate from those establishing a ground for termination. *In re H.J.P.,* 669 S.W.2d 264, 271 (Mo.App.1984). Here, the transcript is replete with evidence of the father's inadequacies. Moreover, in concluding that severance of defendant's parental rights was in the childrens' best interests, the trial court gave weight to the bond between R.H.S. and his three siblings and to the fact that an adoption referral had been made for all four children to be adopted together. Applying the required standard of review, we cannot say "with a

firm belief" that the trial court's judgment is against the weight of the evidence. *See Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. 1976); *In re M K P,* 616 S.W.2d 72, 80 (Mo.App.1981).

## II.

In his last point, the defendant argues that the court's failure to recite certain findings required by § 211.477.5 and § 211.447.3 requires reversal under *In re C.P.B.,* 641 S.W.2d 456, 459 (Mo.App.1982).

The defendant first claims that the trial court failed to specify in the orders what "potentially harmful conditions" continue to exist and, therefore, failed to comply with § 211.477.5, governing the issuance of orders of termination. That statutory section requires that an order recite "the jurisdictional facts, factual findings on the existence of grounds for termination and that the best interests of the child are served by the disposition stated in the order."

Section 211.447.3 states that, in considering whether to terminate the parent-child relationship, the court shall evaluate and make findings on seven delineated factors "when appropriate and applicable to the case." The defendant argues that the court should have made findings under subparagraphs (4) and (5) because those factors clearly apply here. Specifically, the court did not make a finding of "[w]hether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time." § 211.447.-3(4). Nor did the court make a finding of "[t]he parent's disinterest in or lack of commitment to the child." § 211.447.3(5).

In ruling the question whether the trial court adequately specified in its orders the ground for termination as required by § 211.477.5, we must sidestep the defendant's unpreserved claim that § 211.447.2(3) fails to identify "conditions of a potentially harmful nature that continue to exist" or to otherwise notify a parent of just what conduct the statute proscribes.

■ According to the Missouri Supreme Court, that language is an explicit statement that harmful conditions not originally considered could form the basis of the termination. *In re M.E.W., supra,* 729 S.W.2d at 196. Section 211.447.2(3) and subparagraph (a) imply the necessity of a social service plan. Points addressed in the plan, therefore, refer to either the conditions that led the court to assume jurisdiction or to "conditions of a potentially harmful nature." The plan must not be meaningless: due process requires that the plan address the problems that jeopardize a parent's rights. *Cf. In re S.P.W.,* 707 S.W.2d 814, 826 (Mo.App.1986).[5]

In the present case, the trial court's orders tracked the language of § 211.447.-2(3), stating that each of the children has been under the jurisdiction of the court for a period exceeding one year and that "conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parents in the near future." Then, the court specified the following as the conditions of a potentially harmful nature that continue to exist: the defendant's failure to comply with the terms of a social service plan that was approved and found reasonable by the court; the fact that DFS had not been successful in aiding the defendant in adjusting his circumstances or conduct to provide a proper home for the children; his failure to maintain regular visitation or other contact with the children; his failure to provide for the children while they were in foster care, although he

5. The neglect provision of the 1982 version of the termination of parental rights statute included language putting the burden on the person or agency having legal or actual custody of the child to show that "an appropriate plan approved by the court has not been reasonably complied with by the parent or has been unsuccessful." § 211.447.2(2)(b) R.S.Mo. (Cum.Supp. 1984). That section also required that the parents be notified of the court approved plan and provided for a hearing on the plan at the parents' request.

*In re S.P.W., supra,* 707 S.W.2d at 826, holds that neither court approval of nor parental consent to such a plan is the same as or a substitute for a finding in a later termination proceeding of the appropriateness of the plan. A parent cannot be charged with neglect for failing successfully to achieve the goals of a plan that is not found to be appropriate.

was financially able to do so; his volitional criminal conduct and the resulting incarceration in Alabama that "is of such a nature that the child[ren] will be deprived of a stable home for a period of years."

The court's orders reflect detailed findings of fact as to each of those conditions, including a showing of the defendant's failure to comply with each term of the social service plan. Then, the court found that termination of the defendant's parental rights was in the children's best interests, findings supported by evidence of the emotional bonding among the four siblings and the adoption referral recommending that all four children be adopted together.

We cannot say that the trial court's orders are deficient as to jurisdictional elements. Nor can we say that those orders fail to identify the conditions of a potentially harmful nature that continue to exist. Moreover, despite his claim to the contrary, the court's orders do not rest solely on evidence of the defendant's non-compliance with the social service plan. We find that jurisdiction was properly taken and that the orders comply with § 211.477.5. *See In re C.P.B., supra,* 641 S.W.2d at 459. *See also In re H.J.P., supra,* 669 S.W.2d at 271.

Likewise, we hold that the court's failure to make findings under arguably relevant subparagraphs of § 211.447.3 is not reversible error. That statutory section leaves to the trial court's discretion the decision to make findings on the factors it deems applicable to the case. The scope of appellate review is limited to an abuse of that discretion. *See In re George,* 630 S.W.2d 614, 622 (Mo.App.1982).

The court's orders address by implication the concerns of subsections (4) and (5). With little extrapolation, we can conclude that additional services would not be likely to bring about lasting adjustment enabling family reunification at an ascertainable time, § 211.447.3(4): the court found that DFS had not been successful in aiding the defendant and cited numerous examples of the defendant's failure to cooperate with DFS. Moreover, in light of defendant's ten-year prison sentence that prevents family reunification at "an ascer-

tainable time," the court had discretion to find that subparagraph inapplicable to the case.

Finally, the court's orders contain numerous findings indicative of the defendant's disinterest or lack of commitment to the children, including his lack of financial support, his failure to visit, his failure to follow through on all aspects of the court-approved social service plan, and his repeated felonious acts that have caused him to be physically unavailable for the children. *Cf. In re R.E.C., supra,* 716 S.W.2d at 885–86; *In re R.E.M., supra,* 712 S.W.2d at 400–403; *In re B.S., supra,* 710 S.W.2d at 29–30. Although the court could have made a specific finding with reference to § 211.447.3(5), its failure to do so does not amount to an abuse of discretion under the circumstances. *Cf. In re J.I.W.,* 695 S.W.2d 513, 514 (Mo.App.1985); *In re C.P.B., supra,* 641 S.W.2d at 459; § 211.443 (providing that the statutes pertaining to termination of parental rights be construed so as to promote the best interests and welfare of the child).

Accordingly, we affirm the trial court's orders terminating the defendant's parental rights as to R.H.S. and J.L.S.

All concur.