52 S.W.3d 59 (2001)
In the Interest of A.S.O., Plaintiff.
Juvenile Officer, Respondent,
v.
R.L.O. (Natural Mother), Appellant.
No. WD 59344.
Missouri Court of Appeals, Western District.
July 24, 2001.
*61 Ronald R. Holliday, St. Joseph, for Respondent.
David R. Schmitt, St. Joseph, for Guardian.
Candace J. Barnes, St. Joseph, for Appellant.
Before NEWTON, P.J., LOWENSTEIN and SMART, JJ.
LOWENSTEIN, Judge.
R.L.O., natural mother (Mother), appeals from the trial court's termination of her parental rights to A.S.O., her daughter born August 16, 1996. In three of her points on appeal, the mother contends that the trial court erred in terminating her parental rights pursuant to § 211.447.4(3) RSMo 2000.[1] The judgment also relied on § 211.447.2(1). In her fourth point, she argues that the trial court did not make all appropriate findings under § 211.447.6. A.S.O.'s father is not a party to this appeal.

Factual and Procedural History
Mary Bembrick, a social services worker for the Buchanan County Division of Family Services, was assigned to A.S.O's case in August of 1997 when the DFS received a child abuse and neglect report alleging that the mother had no food or diapers for A.S.O. On her initial visit, Bembrick found that the mother's apartment was sparely furnished, that the place was infested with mice and cockroaches, and that A.S.O.'s crib was unsafe. Two days later, Bembrick dropped off diapers, clothes and shoes for A.S.O. and initiated parent-aide services because she thought the mother needed help with parenting skills.[2] Bembrick testified that she frequently took diapers and clothes to A.S.O.
Bembrick initiated several parenting plans aimed at improving the mother's lifestyle. Bembrick also enlisted the services of a family preservation specialist because the mother was "at risk" of losing her child; work with this specialist, too, was largely unsuccessful.[3] Bembrick also testified that during the four years she was assigned to the case, the mother failed to maintain steady employment. She also testified that the mother had a drug habit but never completed any of the several drug programs that she began, and although she tested negative in three urinalysis screens for drugs, she refused on several occasions to submit to further *62 voluntary tests.[4] Bembrick also expressed concerns about lack of diapers, lack of food, a chaotic lifestyle, and the mother's failure to follow through with assistance offered for the family, including housing. During those four years, Bembrick testified that the mother had twenty-three residences.
In Spring of 1998, A.S.O. was taken into foster care (first with her aunt and then with a licensed foster care home because Bembrick "couldn't trust the relatives to let her know what was going on" as they were leaving A.S.O. with her mother and neither A.S.O. nor the relatives informed Bembrick). In July of 1998, the mother lost another job because she was pregnant again. In May 1999, A.S.O. was returned to the mother for an eleven-day trial period in May 1999, because the mother had tested negative in three urinalyses. The trial period ended because: 1) the mother failed to contact Bembrick for a part of the treatment plan; 2) the mother did not answer the door when Bembrick went for a home visit; 3) the mother let the father keep A.S.O. overnight, though there was a warrant out for his arrest; 4) the mother lost her job; 5) the mother had not been living with her mother, though that was part of the treatment plan. Thus, with the exception of the trial period, A.S.O. was in foster care from July 1998, to October 2000, when parental rights were terminated.
Despite the failure of the May 1999 reunification, DFS entered into a social service agreement with the mother on April 20, 2000. The goal was for the mother to provide a safe and stable home environment for a possible reunification with A.S.O. However, the mother failed to comply with this agreement: she did not take scheduled urinalyses; she did not arrange and maintain weekly visits with A.S.O; she did not attend weekly counseling sessions aimed at improving her self-esteem and parenting skills.
Bembrick testified that the conditions that first led to the assumption of jurisdiction by the juvenile court over A.S.O. existed at time of trial. Specifically, Bembrick testified that these conditions were that that the mother admitted drug involvement, that she was unstable in her home and her life, and that she had no steady employment or stable environment for A.S.O.
Dr. Ron Ruhnke, a psychologist employed by the Family Guidance Center in St. Joseph, conducted a psychological evaluation of the mother. He administered tests which measure symptoms and personality patterns, and he conducted a clinical interview. He concluded that the mother's full-scale IQ was 75, which put her intellectual functioning in the borderline range. He testified that those with test results like hers have a "low fund of general information" and that comprehension, which is a general test of common sense and practical information, is typically also fairly low, as is vocabulary. Among other things, the mother scored high on the anti-social scale, indicating that she may be "pretty irresponsible, may have difficulty conforming to the rules and regulations of society, may be unreliable, impulsive, have difficulty with anger, may not be responsible in terms of fulfilling obligations." The mother also scored high on the histrionic scale, indicating that she *63 may have the need for attention and excitement and that she may tend to overreact and be superficial in her relationships with others. Specifically, she may tend to have angry outbursts and get over them quickly as though nothing happened.
Dr. Ruhnke also testified that the mother scored at least moderately high on the narcissistic scale, which indicates that she may be self-centered, may need attention, and may have difficulty empathizing. The mother also scored moderately high on the self-defeating scale, which indicates that she may do things that get her into trouble, perhaps having unhealthy or destructive relationships.
Dr. Ruhnke was able to make some general conclusions based on the administration of the tests and a clinical interview. He testified that the mother in general would be termed "irresponsible, not dependable, someone who has difficulty acknowledging problems about herself, in fact tends to deny problems." Based on the interview and the testing, Dr. Ruhnke diagnosed the mother as having a mixed-personality disorder, with anti-social, histrionic, narcissistic, and self-defeating features.
Another psychologist, Dr. Kathy Harms, conducted a bonding assessment on A.S.O. in June of 2000. She interviewed the mother, observed A.S.O. and the mother interact, and conducted a Parenting Stress Index (PSI), which is a questionnaire assessing how the person feels about being a parent and how the parent feels about the child. Dr. Harms concluded that A.S.O. was not very bonded or attached to the mother. A.S.O. referred primarily to her foster mother as her "mommy." The mother's answers on the PSI indicated that "she did not feel very competent as a parent and that she was pretty depressed." The mother's answers also indicated that "she did not feel that [A.S.O.] was very reinforcing to her as a parent in terms of giving back love, showing affection, those kinds of things."
The mother testified that since August of 1997, she has worked sixteen different places. She testified that she could not keep a job because in the past she was lazy. At trial time, she had no job. She did not complete tenth grade and has not attained a GED. Her income is $50 every two weeks in child support for her son, Chris (born January 30, 1999), who only resides with her about three nights a week and with friends the other nights because he is "hyper" and "hard" for her to handle. She testified that she gives most of that money to the family with whom she is currently residing. She also receives food stamps of $127 per month. She has never had a driver's license and does not own a car, but she has had traffic violations for driving without a license. She owns a couch, which her mom uses, and the bed she sleeps on. Otherwise, she owns no other furniture. She testified that she is free of drugs now but that she never completed a drug treatment program because "going in there made you want to take [drugs] because you had to stand up there and say what kind of drugs you used" and thus she feared relapsing.

Standard of Review
The trial court's decision will be affirmed unless the record contains no substantial evidence to support the decision, the judgment is against the weight of the evidence or the trial court erroneously declared or applied the law, and a reversal will occur only when this court firmly believes the judgment is wrong. In Interest of B.L.B., 834 S.W.2d 795, 799 (Mo.App.1992); In Interest of M.H., 859 S.W.2d 888, 892 (Mo.App.1993). Deference is given to the trial court's ability to assess credibility. Id. The evidence in the record *64 will be viewed in the light most favorable to the judgment. M.H., 859 S.W.2d at 892. If clear, cogent and convincing evidence of any one of the statutory grounds supporting the judgment is shown in the record in addition to a finding that termination in the best interests of the children pursuant to § 211.447.6, the judgment will be affirmed. In Interest of S.C., 914 S.W.2d 408, 413 (Mo.App.1996).

Analysis
Before addressing the mother's points, this court first will address the respondent's argument that the mother's rights were terminated for two different grounds and thus it is unnecessary to consider the mother's appeal as to § 211.447.4(3). The mother's parental rights were terminated pursuant to § 211.447.4(3), which is sometimes known as the "failure to rectify" provision. Although not pleaded, the judgment itself indicated that A.S.O. was in foster care for at least fifteen of the most recent twenty-two months, which is a ground for termination of parental rights. § 211.447.2(1). As such, the respondent juvenile officer argues that the court need not consider whether the trial court's judgment was deficient under § 211.447.4(3) because the existence of even one statutory ground for termination is sufficient.
Courts have long held that "in a termination of parental rights proceeding, one of the grounds for termination, if adequately pleaded and proved, is sufficient to support termination." In Interest of L.T., 989 S.W.2d 673, 677 (Mo.App.1999)(emphasis added). In the case at bar, a review of the pleadings indicates that § 211.447.2(1) was not pleaded, and thus mother had no notice of that ground. In Interest of H.R.R., 945 S.W.2d 85, 88 (Mo.App.1997) (because of due process concerns, it is necessary to terminate parental rights on a ground asserted in the petition). Therefore, this court properly can consider the points raised by the mother, that the trial court erred in terminating her parental rights under §§ 211.447.4(3) and 211.447.6.

I.
In her first point, the mother complains that the trial court erred in terminating her parental rights under § 211.447.4(3) because it did not make findings setting forth which conditions led to assumption of jurisdiction and which of these conditions still remained.
In support, the mother cites In Interest of T.A.S., 32 S.W.3d 804 (Mo.App.2000). In T.A.S., this court reversed under § 211.447.4(3)[5] because the trial court did not make a finding that conditions of a potentially harmful nature continue to exist, nor did the court state which conditions led to the assumption of jurisdiction and which continued to remain at trial time. Id. at 812.
In the case at hand, the trial court noted in its judgment:
The child has been under the jurisdiction of the juvenile court for a period of one (1) year, and the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home, and there is little likelihood that these conditions will be remedied *65 at an early date so that the child can be returned to the parent in the near future. Specifically, the evidence shows that the defendant [R.L.O.] has been unable to maintain a stable residence or maintain employment. She has failed to substantially comply with numerous written service agreements with the Division of Family Services and has failed to show any improvement in her living conditions with the exception that she has been able to stop her previous drug habit.
The mother's contention under her first point is without merit. Although the trial court's findings are not elucidated, the above excerpt indicates that the trial court, with minimal sufficiency, did note the conditions which led to the assumption of jurisdiction, i.e., that the defendant: 1) has been unable to maintain a stable residence; 2) has been unable to maintain employment; 3) has failed to comply with numerous written service agreements with the DFS; 4) has failed to show any improvement in her living conditions; 5) but that she has stopped her previous drug habit. These findings are consistent with Bembrick's testimony of the conditions which led to the assumption of jurisdiction, noted supra. Moreover, unlike in T.A.S., the trial court did note the alternative to the conditions which led to jurisdiction because it included the phrase "....or conditions of a potentially harmful nature continue to exist." Under either standard, the mother's parental rights were terminated by the court for the reasons it listed pursuant to § 211.447.4(3). In short, although the trial court's findings are not a model for future judgments, this court finds that the judgment is minimally sufficient in explaining the conditions which led to assumption of jurisdiction as well as the continuing circumstances.
This point is denied.

II.
In the second point, the mother argues that the trial court erred in terminating her parental rights under § 211.447.4(3) in that it modified the statute by requiring her to move into a separate, independent residence as a condition of preserving her parental rights. She argues, correctly, that no parent has to defend his or her parental relationship on the ground that the child might be better off in another home. In Interest of A.M.C., 983 S.W.2d 635, 640 (Mo.App.1999).
The judgment does not support a finding by this court that the trial court actually required the mother to maintain a separate residence. Not only is the judgment bereft of any language hinting at such a requirement, but also there was testimony that the mother frequently changed residences (twenty-three times since DFS became involved) and that most of those residences were substandard.
This point is denied.

III.
The mother's third point is that the trial court erred in terminating her parental rights because it failed to comply with § 211.447.4(3) in that it did not make adequate findings on each of the four enumerated factors and that its findings did not address evidence favorable to her.
In its judgment terminating the mother's parental rights under § 211.447.4(3), the trial court noted:
Pursuant to Section 211.447..3[sic], the court makes the following findings:
1. The defendant has failed to substantially comply with the terms of various written service agreements or social service plans;
*66 2. The Division of Family Services has failed to aid the parent on a continuing basis in adjusting the defendant's circumstances or conduct to provide a proper home for the child;
3. There are no findings with reference to 211.447..3(c) and (d) [sic].
"The court is required to make specific findings on each of these four factors. If a factor is not relevant to the case, the court should state why the given factor is not relevant." T.A.S., 32 S.W.3d at 810 (citation omitted)(emphasis in original). Strict and literal compliance with the statutory requirements is necessary in termination of parental rights cases. Id. "The provisions of the statute authorizing termination must be read with a measure of common sense and reasonableness, and not interpreted in a hyper-technical fashion." In Interest of J.W., 11 S.W.3d 699, 704 (Mo.App.1999). However, "[s]tatutory mandates to make findings may not be overlooked on appeal." T.A.S., 32 S.W.3d at 810.
In this case, it is clear that the trial court failed to follow the statutory mandate of making specific findings on each of the four factors. As to § 211.447.4(3)(a), the court was required to consider and make findings on "the terms of the social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms." Though the trial court did note that the mother "failed to substantially comply with various service agreements," this finding is insufficient to satisfy the statute. Recognizing that in many cases, including the case at hand, more than one DFS service plan is implemented, this court held that § 211.447.4(3)(a) "requires the court to make a finding which sufficiently identifies the plan and the terms thereof, when determining and finding the extent to which the parties have made progress in complying with such terms." In Interest of N.M.J., 24 S.W.3d 771, 781 (Mo.App.2000). The purpose is to ensure that all reasonable means to help the parent remedy the adverse conditions were utilized to no avail. Id. at 781-82 (citation omitted). In this case, there is no such identification of the plans and terms thereof, and thus the trial court's findings as to § 211.447.4(3)(3)(a) are unacceptable.
As to § 211.447.4(3)(b), the trial court merely found that the DFS "has failed to aid the parent on a continuing basis in adjusting the defendant's circumstances or conduct....." Again, the trial court made a conclusory remark that the DFS's efforts were unsuccessful, but failed to make findings as required by the statute.
As to §§ 211.447.4(3)(c) and 211.447.4(3)(d), the trial court merely noted that "there were no findings." As noted supra, "[i]f a factor is not relevant to the case, the court should state why the given factor is not relevant." T.A.S., 32 S.W.3d at 810. See also In Interest of D.T.B., 944 S.W.2d 321, 323 (Mo.App.1997)(even if a factor is irrelevant to the disposition of the case, the court is obliged to make a finding to that effect). The court has failed to provide the reason or reasons why these factors are not relevant.
The mother's related argument in this point is that the trial court did not address evidence favorable to her. In support, she cites H.R.R. and T.A.S. The mother is misconstruing the holdings of those cases, however. They do not stand for the proposition that the trial court must discuss evidence favorable to the mother, but rather, that its judgment must include findings on the factors such that a reviewing court can be assured that the trial court properly considered the statutory factors in deciding whether to terminate parental rights.
*67 Finally, the court addresses the respondent's argument that because the proof of one of these factors is sufficient to terminate parental rights, the trial court need not have addressed the other factors. Indeed, proof of one factor is sufficient to terminate parental rights. In Interest of S.C., 914 S.W.2d 408, 413 (Mo.App.1996). However, as noted supra, in order to terminate under one of these prongs, the trial court must make findings as to all of the prongs or explain why the prong is not relevant. T.A.S., 32 S.W.3d at 810.
This point is granted.

IV.
In her final point, the mother argues that the trial court erred in terminating her parental rights by failing to comply with § 211.447.6 in that it did not make findings on all appropriate factors and did not address evidence favorable to her.
The trial court's findings under § 211.447.6 were as follows:
1. The child is not bonded to the defendant;
2. The defendant has maintained contact with the child although the evidence showed that she missed some visits and left some visits with the child early;
3. The defendant has been unable to contribute payment for the care and maintenance of the child;
4. No additional services would be likely to bring about lasting parental adjustment enabling the return of the child to the parent within an ascertainable period of time;
5. The defendant does show interest in the child.
The mother objects to the trial court's findings only as to the factors in §§ 211.447.6(1) and 211.447.6(4). Section 211.447.6 states:
When considering whether to terminate the parent-child relationship pursuant to.... subsection 4 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case....
(1) The emotional ties to the birth parent;....
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable amount of time.
Unlike § 211.447.4(3), § 211.447.6 "contains no mandatory language directing the juvenile court to make specific findings with respect to each of its subparagraphs." N.M.J., 24 S.W.3d at 783 (citations omitted). The court need only make findings on the prongs "when appropriate and applicable to the case." § 211.447.6. Because findings under this subsection of the statute are discretionary, "[t]he scope of appellate review is limited to an abuse of that discretion." T.A.S., 32 S.W.3d at 811.[6]
Again, the mother notes in a related argument that this court has reversed other termination of parental rights cases when the trial court has failed to make findings where there is evidence, some favorable to the parent, that supports a finding. This argument was addressed supra under the third point. In short, unlike in T.A.S., N.M.J., D.T.B., the trial court made specific findings as to the relevant factors and the record supports those findings. Again, although the trial court's *68 findings as to § 211.447.6 are not a model for future judgments, the court finds this portion of the judgment minimally sufficient.
The portion of the judgment terminating mother's parental rights pursuant to § 211.447.2(1) is reversed. The remainder of the judgment, based on § 211.447.4(3), is reversed and remanded with directions that the trial court enter its findings, conclusions and judgment in accordance with § 211.447.
All concur.
NOTES
[1] All further statutory references are to RSMo 2000, unless indicated otherwise.
[2] Amy Jenkins, a social work parent aide, teaches general parenting skills in areas such as discipline, nutrition, and hygiene. Jenkins worked with the mother in several small stints, but she was never able to work on the mother's parenting skills and instead had to spend the time helping her reach a basic level of existence: having food and clean clothing at the home, maintaining a stable home environment, etc. Jenkins also testified that at least four out of five of the mother's residences that she visited were unacceptable residences for A.S.O.
[3] Mary Jane Tabor, who was a family preservation specialist, worked with the mother to try to keep the child safe at home with the goal of keeping the family together. A family preservation specialist is called in only when a child is "at risk," meaning there are intense problems at the home and the child is at risk of being removed by the DFS. After meeting with the mother in October of 1997, she noted that the home was sparsely furnished and that there was no baby bed. Also that month, the mother missed appointments and generally did not cooperate with Tabor. In November of 1997, not only did the mother miss more appointments, but also her food stamps were rejected because she failed to follow the application requirements. Tabor testified that overall, she was unsuccessful in meeting the goals of Family Preservation.
[4] Wattie Thomas Palmer, a substance abuse counselor, corroborated Bembrick's testimony. He testified that he was unable to work through the mother's drug problem because of her denial that she had a drug problem and because of her poor attendance: she was admitted and discharged from the drug program several times. Palmer testified that unless the mother completed a program, she would be likely to use drugs again.
[5] T.A.S. was decided under an earlier version of § 211.447, but the "failure to rectify" subsection analyzed here differs from T.A.S. only in how it is numbered; the language is exactly the same.
[6] Again, T.A.S. refers to an earlier version of 211.447.6; however, aside from non-substantive changes, the content is the same.