**In the Interest of S.M.F.**

**Juvenile Officer, Respondent,**

v.

**C.E.F.(Mother), Appellant.**

**Nos. WD 75548, WD 75626.**

Missouri Court of Appeals,
Western District.

March 19, 2013.

Peter W. Schloss, Liberty, MO and Christopher T. Patterson, Kansas City, MO, for appellant.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

C.E.F. ("Mother") appeals from the trial court's judgment terminating her parental rights to her daughter, S.M.F. ("Daughter"). The trial court terminated Mother's parental rights to Daughter based upon two statutory grounds: abuse and neglect, pursuant to section 211.447.5(2); and failure to rectify, pursuant to section 211.447.5(3).[1] In her nine points on appeal, Mother argues that the trial court erred in finding that there was a statutory ground for terminating her parental rights and in finding that termination of her parental rights was in the best interests of Daughter. We affirm and remand with instructions to address a pending motion for attorney's fees.

### Factual and Procedural History[2]

On August 16, 2010, at the age of eighteen, Mother gave birth to Daughter. The following day, Children's Division received a hotline report advising Mother was exhibiting abnormal behavior.[3] As a result, a Family Centered Services case ("FCS case") was opened to provide services to Mother through the Children's Division.

Tammy Jo Glick, Platte City, MO, for respondent.

1. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

2. On appeal from a judgment of termination of parental rights, we review the evidence in the light most favorable to the judgment. *In re B.J.H., Jr.*, 356 S.W.3d 816 n. 1 (Mo.App. W.D.2012).

3. Mother was reportedly refusing to dress, repetitively informing the nursing staff that she was hyperventilating and unable to breath although her vital signs were normal, and took numerous showers throughout the day.

When discharged from the hospital, Mother and Daughter moved in with Mother's mother, A.S. ("Grandmother").[4] However, due to lack of cooperation by the family, the FCS case was closed unsuccessfully on October 25, 2010, and the matter was referred to the Juvenile Office.

On December 3, 2010, Children's Division received notification that Mother was hospitalized for post-partum depression and refusing to take her medication. Mother was due to be released on December 6, 2010. The treating psychiatrist recommended that Daughter not be placed in the same home as Mother due to safety concerns as Mother was exhibiting psychotic and delusional symptoms.[5] On December 6, 2010, Daughter was taken into temporary protective custody and placed in foster care. Mother was discharged from the hospital that same day but checked herself back in the following day. On December 7, 2010, the Juvenile Officer filed a petition alleging that Daughter was in need of the care and treatment of the court in that Mother had been diagnosed with schizophrenia and severe psychosis such that Daughter's safety is at risk if left in Mother's care. A protective custody hearing was held on December 9, 2010, where it was ordered that Daughter remain in the custody and control of the Children's Division for placement in alternative care. On December 16, 2010, Mother was again discharged from the hospital and moved into her father's ("Grandfather") home.

On January 20, 2011, the Juvenile Officer filed a First Amended Petition alleging that Daughter was in need of the care and treatment of the court in that Mother is in a mental and emotional state such that she is unable to properly care for Daughter or assure her safety and welfare. On February 17, 2011, the trial court entered its "Finding of Jurisdiction Final Order and Judgment of Disposition" finding that Daughter was in need of care and treatment; that Mother is in a mental or emotional state such that she is unable to properly care for Daughter or assure her safety and welfare; that removal of Daughter was necessary for her protection; and declaring Daughter a ward of the State.

On April 4, 2012, the Petition for Termination of Parental Rights was filed.[6] A trial was held June 20 and 25, 2012. The following testimony was adduced at trial.

Gwen O'Brien ("O'Brien"), the Circuit Manager at the Children's Division testified that pursuant to the FCS case, services were offered to Mother when she was discharged from the hospital while she was residing with Grandmother but that the services were eventually terminated because Grandmother would not allow access to her home. O'Brien testified that approximately five weeks after the closing of the FCS case, the Children's Division received a hotline call alleging additional child abuse and neglect in that Mother was exhibiting some mental health post-partum psychosis such that she was unsafe to care for Daughter. The Children's Division met with the family and Daughter was placed in protective custody.

Elizabeth Sharr ("Sharr"), a Children's Service Worker with the Children's Divi-

---

4.  Grandmother was no longer married to Mother's father ("Grandfather"). Grandmother had remarried and had five additional children living in her home.

5.  Mother was losing blocks of time and reported to the doctor that Daughter was three weeks old when she was actually three months old.

6.  On May 23, 2012, A.J.L. ("Father") filed a consent to the termination of his parental rights and adoption.

sion was assigned to the case after the protective custody hearing. Sharr testified that Daughter was placed in protective custody because the psychiatrist at the hospital recommended Daughter not reside in the same home as Mother. Sharr testified that the concern that Mother is unable to properly care for Daughter remains.

Sharr stated that throughout the pendency of the case, she entered into four court-approved Family Treatment Plans/Written Service Agreements ("Treatment Plans") with Mother from January 2011 to October 2011. The Treatment Plans identified the goals for Mother, and the tasks to accomplish to achieve those goals, in order for reunification with Daughter. The requirements of Mother per the terms of the Treatment Plans, as a whole, included: (1) attend all appointments with mental health providers; (2) actively participate in therapy services and work on understanding how the decline in her mental health impacted Daughter; (3) take all prescribed medications; (4) complete a psychological evaluation and parenting assessment and follow recommendations; (5) become educated on the physical, educational, and emotional developments of an infant; (6) attend and be on time for all scheduled visits with Daughter; (7) choose and provide contact information for mental health service providers; (8) maintain signed releases for service providers; (9) participate in a psychiatric assessment and follow resulting recommendations; and (10) attend all appointments with Triality Tots, the parent education provider.

Sharr testified that in conjunction with the Treatment Plans, Children's Division repeatedly provided Mother referrals for community services throughout the case including: Social Security for disability; Dr. Leslie Jones ("Dr. Jones") at Synergy Services for psychological evaluation and a parenting assessment; Family Support Division for medical assistance; three agencies to help with her job search; multiple counseling services, including a Christian counselor because Mother specified that she wanted a faith-based counselor; psychiatric services; and multiple housing programs including a transitional living program for housing assistance. The only referral Mother pursued was the psychological evaluation and parenting assessment with Dr. Jones. Dr. Jones recommended individual therapy to help Mother address coping skills to manage her stress and anxiety, parenting classes, and continued psychiatric care and medication.

Sharr testified that when Daughter first came into care, Mother participated in individual therapy with Sharon Rider ("Rider") with Dipoto Counseling Group but Mother stopped attending after March 3, 2011. In February 2011, Rider reported that Mother has poor insight and judgment; that Mother has no specific plans for caring for Daughter other than to stay with her parents; and that Mother has minimal insight into her psychiatric condition and wants off all medication.

During that time, Mother's psychiatrist was Dr. Daniel Spurlock ("Dr. Spurlock") with Northland Psychiatric Specialist. However, Mother terminated his services in early March 2011. On March 8, 2011, Dr. Spurlock reported that Mother was to return visit and continue medications. Dr. Spurlock noted that Mother prefers not to take medication and disagrees with Dr. Spurlock's diagnosis of schizophrenia.

Sharr testified that after entering into the fourth Treatment Plan in October 2011, Mother contacted counselor Trish Beach ("Beach") and participated in treatment with her for a period of time beginning in December 2011. Sharr noted that Mother did not participate in any therapy

between early March 2011 and December 2011, even though she was under court order to do so per the Treatment Plans.

Sharr testified that Mother saw psychiatrist Dr. Shawn Willson ("Dr. Willson"), one time, on March 20, 2012. Dr. Willson diagnosed Mother with psychosis and recommended hospitalization. Mother was not hospitalized.

Regarding parent education, Sharr testified that Mother had two visits with Triality Tots before Daughter was taken into custody as part of the FCS case. Services were resumed in March 2011 but were discontinued August 29, 2011, because Mother was minimally cooperative.

Sharr concluded that there are no additional services that Children's Division can provide to make reunification possible or make a lasting parental adjustment enabling the return of Daughter to Mother within a reasonable period of time. Mother has not cooperated in receiving offered services. Mother has failed to follow up on community service referrals. Mother has gone for consistent periods of time without being under a psychiatrist's care, over a year during this case, and has not consistently taken her medication. Mother never provided contact information for a health provider that she was seeing or medications she was taking during that time. Sharr noted that for a period of at least nine months during the case, Mother did not participate in individual counseling. Mother was given referrals for housing but there was a significant period of time during this case that she was either homeless or was not notifying the Children's Division where she was residing. She was provided opportunities for visitation with Daughter. However, there was a significant period of time where Mother either

did not call to confirm a visit, did not show up for visits, or left no contact information to arrange visits.

Sharr testified that Mother never contacted Social Security about disability. Mother is not claiming a disability is preventing employment. Mother has been minimally employed. She has had one job during the pendency of the case at Taco Bueno between April 15 and June 15, 2011, making a total of $169.15. During the case, Mother provided no contributions, gifts, monies, clothing, or food whatsoever for the care of Daughter since February 2011.

Sharr testified that in February 2012, she observed a visit between Mother and Daughter at the Children's Division. This was the first visit between Mother and Daughter since July 2011. Sharr stated that Daughter interacted with Mother like she would with anyone. Daughter did not appear to be attached to Mother. Sharr stated that Mother spent long periods of time during the visit, approximately ten minutes at one point, just staring out the window and not interacting with Daughter. Mother did not appear to be focused on Daughter. Additionally, there were concerns about the safety of that visit due to Mother's aggressive and potentially violent behavior at a family support team meeting earlier in the month and, in January 2012, Mother had been charged with assaulting her step-father.[7] Sharr testified that Daughter has not bonded with Mother and termination of her parental rights is in Daughter's best interests. Sharr stated that the Children's Division made reasonable efforts but failed to make reunification possible because:

---

7. The record reflects that Mother was charged with assault against her step-father for incidents that occurred on January 15, 2012, and February 14, 2012. The charge has been reportedly dismissed.

[Mother] has made little or no progress in demonstrating that she can be a safe, stable, and nurturing parent for Daughter. In fact, she's consistently failed to demonstrate that she can provide a safe, stable, and nurturing environment for herself. She has consistently failed to engage in a number of services which could have rectified the safety concerns long held by the Children's Division.

Sharr added that Daughter was placed in the custody of Mother's maternal grandparents. The maternal grandparents reside in Iowa but maintain a positive relationship with Mother and have expressed the intent to adopt Daughter in the event Mother's parental rights are terminated.

Dawn Dooley ("Dooley") testified that in her capacity as a parent educator with Triality Tots' Home Visitation Program she provided services to this family in September 2010, as part of the FCS case. Dooley was contacted by Sharr to reengage Mother in March 2011, to restart the Parent Education Program. Dooley testified that Mother's housing was unstable in that her first meeting with her was at Grandfather's house but the next two were at homes of Mother's friends. As such, at the third visit, Dooley gave Mother housing referrals. Mother did not make any follow-up calls regarding the housing referrals.

Dooley testified that she observed visits between Mother and Daughter beginning in April 2011 at the Children's Division. Dooley's services were terminated in August 2011. Dooley testified that during the last few visits she observed that Mother was "just very—not focused." Dooley reported that Mother struggled to change Daughter's diapers for approximately twenty minutes, and that Dooley eventually had to intervene.

Dooley reported that during a couple of visits, which were only an hour long once a week, Mother tried to go to sleep or zoned out. Dooley noted Mother missed twelve visits between March and August. Notwithstanding, Dooley stated that Mother was always affectionate when present with Daughter, and that she felt there was a bond between Mother and Daughter during her the time of services.

Beach, a Mental Health Therapist with Creative Foundations, LLC, began working with Mother in December 21, 2011. Beach testified that Mother attended seven out of eleven scheduled visits which occurred at Grandmother's home. Beach stated that Mother was verbally aggressive with her. Beach testified that the therapy never got to real issues as it was "lots of dancing around and exploring and avoidance, and I can't say that there were any particular issues that were ever directly addressed." Beach testified that she tried multiple types of therapy including art therapy, role playing, and cognitive thinking. Beach testified that at the February 1, 2012 session, she became concerned because Mother became verbally aggressive in discussing the distinction between whether she was tired from stress or tired from being a mother. Beach felt that in this discussion, Mother's thoughts were disorganized and incoherent at times. Mother reported to Beach that she was not currently seeing a psychiatrist or taking medication but that she had made an appointment with Dr. Willson which she had to reschedule. Beach lost contact with Mother after February 8, 2012. She believed there was a risk in contact between Mother and Daughter.

Lona Fowler, Circuit Clerk with Platte County Child Support Division, testified that Mother's child support obligation is $206 per month; that the first payment was due August 15, 2011; that no payments had been made; and that the arrearage was $2,266 as of June 2012.

Rhonda Haith ("Haith"), Deputy Juvenile Officer for Platte County, testified that she observed the visitation between Mother and Daughter in February 2012 and June 15, 2012. Haith testified that at the February 2012 visit, Mother just seemed "out of it" and argumentative. She observed Mother rolling her eyes and sighing. She stated that the June visit went well although she did not know if Daughter recognized Mother. Haith testified that Mother could not accomplish changing Daughter's diaper. Mother realized that the diaper needed to be changed early in the hour long visit but never addressed the situation.

Christine Trueblood ("Dr. Trueblood"), a psychiatrist at the Lilac Center, first met with Mother on May 16, 2012, and met with her a total of three times. At the first meeting, a little over a month before trial and over a month after the Petition for Termination of Parental Rights had been filed, Mother was very agitated, and was exhibiting signs of mania and intrusive behavior. Mother was religiously preoccupied and believed that her step-father who accompanied her might be Jesus and that she was the whore of Babylon from the book of Revelations. Mother was adamant against medications. She had just been discharged from hospitalization. Mother was returned to the hospital that evening after acting inappropriately in public which resulted in police intervention. Mother was released later that evening.

The following day Dr. Trueblood saw Mother again when Grandmother called reporting Mother was agitated. After this visit, mother was hospitalized for approximately a week. Shortly thereafter, Mother was again hospitalized for approximately two weeks and was discharged on June 12, 2012. Dr. Trueblood saw Mother the following day and observed her to be much improved. Dr. Trueblood attributed this to Mother's agreement to take the medication Depakote, which she had previously refused. Dr. Trueblood diagnosed Mother with Bipolar Disorder. Dr. Trueblood stated that she believed Mother may be able to safely parent Daughter at some point if she continued to take Depakote. Regarding a timetable, Dr. Trueblood stated:

I think in six months with some supervised visitation for a month or two, with more parent education, with more life skills training, and that kind of support, we're going to have a much better feel for: Is this going to work? Is this not going to work on a long-term basis?

Mother testified that she had been residing with Grandmother for the past seven months. Mother conceded that she had been unstable in the past but that she was taking new medications for her anxiety and was doing much better.

Mother conceded that she failed to provide any financial care to Daughter. Mother stated that she was not employed and the longest job held was for a period of six weeks. Mother testified that it was not that she did not want to be employed but that she just failed to be employed. Mother admitted that there were times during the pendency of the case when she could have held a job; that she was stable enough but her anxiety made it hard to do so.

Mother admitted that she provided nothing at all to Daughter during the pendency of the case. She stated that she had a lot of clothing and formula for Daughter but just never put it in the diaper bag.

Mother testified that she wants to provide for Daughter and has applied for jobs in the week prior to trial at retail stores and McDonald's. Mother stated that she thinks she will be able to maintain employment at McDonald's as it is close to home. Mother testified that her home with

Grandmother is stable now and that Mother has not been "bouncing around." Mother stated that she can remedy problems in this case within six months because she is stable. Mother acknowledged that she cannot be "bouncing around" to different residences and fail to take her medications.

Mother stated that she missed visitations with Daughter due to instability of not having a place to stay and bad transportation. Mother stated that she failed to attend, call or confirm a visit for July 25, 2011, because she was with a person named Sharif, a cab driver she had met and started staying with for a couple of weeks. Likewise, Mother testified that she failed to attend, call or confirm a visit for August 15, 2011, the day before Daughter's first birthday, for the same reason. Mother stated that she did not remember the next visit which occurred on February 10, 2012.

Mother admitted that she did not complete a parenting program, and failed to notify the Children's Division of changes in her residence, because she was moving around a lot and just forgot, and because she did not want them to find out she was not taking her medication.

Mother testified that she understood that during the pendency of the case she was expected to take her medication, seek counseling, and learn about her Daughter's emotional and physical development. Mother admitted that she did not see a psychiatrist from March 8, 2011, through February 2012; that she failed to participate in individual therapy; and that she failed to take medications from March 8, 2011, until May 2012, without any mental health provider agreeing that she did not need them. Mother agreed that she failed to meet the goals of her Treatment Plans

and that only shortly before the trial did she start to take steps towards meeting those goals.

The trial court entered its judgment on July 24, 2012, finding two separate grounds for termination of Mother's parental rights to Daughter: (1) Mother abused or neglected Daughter by failing to support; and (2) Mother failed to sufficiently rectify the underlying situation. The trial court found that termination was in Daughter's best interest. On August 17, 2012, Mother filed a motion to amend the judgment which was sustained in part after a hearing.[8] An amended judgment ("the Judgment") was entered on September 12, 2012. Mother appeals.

## Standard of Review

A trial court's authority to terminate parental rights is purely statutory. Section 211.447.6 requires two findings before parental rights may be terminated. First, the trial court must find that at least one statutory ground for termination of parental rights exists. Section 211.447.6. The trial court's finding must be supported by "clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of [section 211.447]." *Id.* Evidence is clear, cogent and convincing, if it "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004).

We review the trial court's judgment regarding the establishment of a statutory basis for termination of parental rights " 'by determining whether or not it is supported by substantial evidence, is

---

8. The judgment was amended to include the finding that there was no evidence that Mother committed a severe act or recurrent acts of physical, emotional or sexual abuse toward Daughter, pursuant to section 211.447.5(2)(c).

consistent with the weight of the evidence, or accurately declares and applies the law.'" *In re T.A.L.*, 328 S.W.3d 238, 246 (Mo.App. W.D.2010) (quoting *In re C.K.*, 221 S.W.3d 467, 471 (Mo.App. W.D.2007)). "[The] clear, cogent, and convincing standard must be considered when determining whether the trial court's judgment is supported by substantial evidence or is against the weight of the evidence." *Id.*

■ If the trial court finds a statutory basis for termination of parental rights exists, it moves to its second inquiry— whether terminating parental rights is in the best interests of the child. Section 211.447.6. "On that question, the standard of proof at trial is a preponderance of the evidence, and the standard of review on appeal is abuse of discretion." *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

■ We closely review judgments terminating parental rights because they implicate a fundamental liberty interest protected by the United States Constitution— the right to raise one's child. *T.A.L.*, 328 S.W.3d at 246 (citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." *K.A.W.*, 133 S.W.3d at 12. Thus, "[s]tatutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *Id.*

### Analysis

#### Point I

■ For her first point, Mother argues that the trial court erred in terminating Mother's parental rights pursuant to section 211.447.2(1) because that section is not a basis for termination of parental rights, and is instead a trigger for filing a petition for termination of parental rights.

Mother's argument is partially correct. Section 211.447.2(1) provides that "a petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division ... when [i]nformation available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months." "'Section 211.447.2(1) creates a temporal trigger specifying when a juvenile officer '*shall*' file a termination petition....'" *In re B.J.H., Jr.*, 356 S.W.3d 816, 824 (Mo.App. W.D.2012) (quoting *In re M.N.*, 277 S.W.3d 843, 844–45 (Mo.App. W.D.2009)). "Section 211.447.2(1) does not establish a basis for termination." *Id.* (citing *In re M.D.R.*, 124 S.W.3d 469, 476 (Mo. banc 2004)). "Instead, it requires a petition to be filed, which 'merely opens the door' for the state to prove that statutory grounds for termination exist." *Id.*

Despite Mother's accurate reading of section 211.447.2(1), Mother fails to attribute the proper construction to the trial court's reference to that section. The Judgment states, in relevant part:

12. That pursuant to section 211.447.2(1) RSMo, the juvenile [S.M.F.], has been in foster care for at least fifteen of the most recent twenty-two months; specifically, the juvenile has been in foster care since December 6, 2010.

The first thirteen paragraphs of the Judgment were all related to jurisdiction, identification of the parties, and procedural history.

In the fourteenth paragraph of the Judgment, the trial court begins its findings relevant to the statutory grounds for termination of parental rights. Paragraph

fourteen states: "Pursuant to section 211.447.5, RSMo., the Court makes findings on the following conditions or acts of the parents[.]"

It is clear in that the trial court merely referenced section 211.447.2(1) to establish that the jurisdictional trigger to file the petition for termination of parental rights had been satisfied. *See B.J.H.*, 356 S.W.3d at 825. There is no indication that section 211.447.2(1) was relied upon by the trial court as a statutory ground for termination.

Point One is denied.

***Points II, III, IV, and V—Section 211.447.5(2) Abuse and Neglect***

In Points Two, Three, Four, and Five, Mother challenges the trial court's finding of a statutory ground for termination pursuant to section 211.447.5(2)(d), that Daughter was abused or neglected due to Mother's failure to support. Mother claims that (1) the trial court erred in finding that Mother had the physical and/or financial ability to support Daughter because it relied on a lack of evidence of Mother's inability rather than affirmative evidence of her ability; (2) the trial court's findings were against the weight of the evidence; (3) the trial court's findings were not supported by substantial evidence; and (4) the trial court's findings were insufficiently detailed and conclusory. We disagree.

■ To terminate parental rights on the basis of abuse or neglect, the trial court must find that the child has been subject to abuse or neglect and make an affirmative finding on at least one of the factors in section 211.447.5(2)(a)-(d). *In re B.C.K.*, 103 S.W.3d 319, 327 (Mo.App. S.D.2003). Section 211.447.5(2)(d) provides, in pertinent part:

5. The juvenile officer or the division may file a petition to terminate the pa-

rental rights of the child's parent when it appears that one or more of the following grounds for termination exist:

(2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

. . . .

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental or emotional health and development.

Here, the trial court found that Daughter has been abused or neglected, and that pursuant to 211.447.5(2)(d):

[Mother] although physically and financially able, repeatedly and continuously failed to provide the child with adequate food, clothing, shelter, education, and other care and control necessary for the child's physical, mental and emotional health and development.

i. There was no evidence presented that indicated that [Mother] was unable to obtain and maintain employment.

ii. On the 15th day of August 2011, the Missouri Department of Social Services, Division of Child Support Enforcement ordered [Mother] to pay the sum of $206.00 per month in support for the juvenile. Lona Fowler, of the Platte County Circuit Clerk's Office certified that as of June 20, 2012, [Mother] has paid $0 for the support of the juvenile, with an arrearage of $2,266.00.

■ There was substantial evidence that Mother had the ability to support Daughter. Mother had her GED and had held a job for a period of six weeks during

the pendency of this case. Mother explained that her failure to maintain employment was primarily due to her failure to take her medication and her "bouncing around" between residences. There was no evidence presented that Mother sought employment other than at the time of trial when Mother reported that she had submitted applications for employment at retail stores and at McDonald's.

It is undisputed that Mother did not provide financial or any other support to Daughter. Sharr testified that Mother made no contributions of gifts, monies, clothing, or food for the care of Daughter since February 2011. Likewise, Mother testified that she had not provided any financial support for Daughter. Mother conceded there were times during the pendency of the case when she could have held a job but failed to do so. Mother admitted that she provided nothing at all to Daughter. Mother testified that she had a lot of clothing and formula for Daughter but failed to put it in the diaper bag for her visits.

In *In Interest of D.C.H.*, 835 S.W.2d 533, 535 (Mo.App. S.D.1992), the trial court rejected the Mother's claim that she was unable to financially provide support as she was unemployed where the evidence presented that she was a high school graduate, had been employed in the past, and could at least work in a sheltered workshop. Likewise, here, there was evidence that Mother had her GED, was employed in the past, and conceded that she was able to work. *See also, In Interest of R.E.C.*, 716 S.W.2d 879, 884 (Mo.App. W.D.1986) (where there was evidence that mother was a high school graduate, no evidence that she was incapable of employment, and the record showed no effort made to meet monthly support obligation supported finding that mother failed to provide financial support to the extent she was able); *In re*

*Interest of A.L.B.*, 743 S.W.2d 875, 882–83 (Mo.App. E.D.1987) (evidence of financial distress does not excuse obligation to support; "The terms of the statute—'adequate' and 'financially able'—are flexible. The General Assembly designed this flexibility to cover the spectrum of factual situations and parental finances."); *In the Interest of R.K.*, 982 S.W.2d 803, 807 (Mo. App. W.D.1998) (substantially reduced wages received by an incarcerated parent does not excuse his statutory obligation to make monetary contributions to support child; even a minimal contribution evinces parent's intent to continue the parent/child relationship).

In the alternative, even assuming Mother's failure to take her medication (and thus to manage her mental disease) compounded her inability to secure employment, Mother offers no explanation for her failure to avail herself of the repeatedly provided referrals for community services such as social security and food stamps which would have provided her some means of providing support to Daughter.

Substantial evidence supported the trial court's finding that Mother had the ability to support Daughter, but failed to do so. We reject Mother's assertion that the trial court fails to adequately explain the affirmative evidence in the record supportive of the trial court's conclusion, requiring us to conclude that the mere non-payment of support caused the trial court to find a basis to terminate pursuant to section 211.447.5(2)(d).

Finally, Mother claims that the Judgment does not identify any care, safety or welfare need of Daughter that Mother was unable to provide, and fails to specifically elaborate how Daughter was abused or neglected at the time jurisdiction was taken, the extent to which those conditions persisted at the time of termination, or how the abuse or neglect cited had or will

have a detrimental impact on the child. We disagree. The trial court made the statutory findings required by section 211.447.5. Additionally, the trial court found:

> The testimony and records received by this Court were undisputed in that [Mother] struggles to take care of herself and her own significant problems. Her extensive history and failure to establish stability, maintain employment and a consistent residence for herself and [Daughter] makes it unlikely that her home in the foreseeable future will be acceptable as a permanent placement for [Daughter]. · [Mother] is unable to provide care appropriately for [Daughter's] ongoing physical, mental or emotional needs in the reasonable foreseeable future.

The trial court did not err in finding a basis for termination pursuant to section 211.447.5(2).

Points Two, Three, Four, and Five are denied.

***Points VI, VII, and VIII—Section 211.447.5(3)—Failure to Rectify***

■ In Points Six, Seven, and Eight, Mother challenges the trial court's finding of a statutory ground for termination pursuant to section 211.447.5(3). Mother claims that: (1) the findings are insufficiently detailed and impermissibly conclusory in failing to specifically identify what conditions of a potentially dangerous nature continue to exist, or to explicitly consider whether these conditions indicated a likelihood of future harm to Daughter;[9] (2) that the trial court's finding that conditions of a potentially harmful nature continue to exist is against the weight of the evidence; and (3) that the trial court's

finding that conditions of a potentially harmful nature continue to exist is not supported by sufficient evidence. We disagree.

Section 211.447.5(3) provides, in pertinent part:

5. The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that one or more of the following grounds for termination exist:

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child[.]

Here, the trial court found:

9. Mother's Point Relied On VI mistakenly associates "abuse or neglect" with section 211.447.5(3) which is the section number for "failure to rectify." Mother acknowledges the mistake in her reply brief and states that it is intended to be an argument regarding "failure to rectify."

Pursuant to section 211.447.5(3), RSMo., [Daughter] has been under the jurisdiction of the Court for more than one year, and conditions of a potentially harmful nature continue to exist, and there is little likelihood that those conditions will be remedied at an early date, so that [Daughter] can be returned to the parents, in the near future. Further, the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Pursuant to Section 211.447.5(3)(a), RSMo., [Mother] has made little progress in complying with the terms of the social service plans entered into by [Mother] and the Children's Division. Records and testimony indicate that [Mother] signed social service plans as follows:

The Judgment then sets forth a lengthy recitation of the terms of the four court-approved Treatment Plans entered into by Mother from January 2011 to October 2011. The requirements of the Treatment Plans as a whole included: (1) attend all appointments with mental health providers; (2) actively participate in therapy services and work on how the decline in Mother's mental health impacted Daughter; (3) take all prescribed medications; (4) complete a psychological evaluation and parenting assessment and follow recommendations; (5) become educated on the physical, educational, and emotional developments of an infant; (6) attend and be on time for all scheduled visits with Daughter; (7) choose and provide contact information for mental health service providers; (8) maintain signed releases for service providers; (9) participate in a psychiatric assessment and follow resulting recommendations; and (10) attend all appointments with parent education provider Triality Tots. The trial court further found, in pertinent part:

Pursuant to Section 211.447.5(3)(b), RSMo., the efforts of the juvenile officer, Children's Division and other agencies to aid the parent on a continuing basis in adjusting [Mother's] circumstances or conduct to provide a proper home for the child have failed, due to [Mother's] refusal and lack of cooperation in that:

i. [Mother] has failed to participate in visitation with [Daughter] as arranged ... and as ordered.... [Lengthy recitation of visitation history replete with canceled and missed visits].

Because of [Mother's] continued refusal to comply with this Court's orders to access mental health services, visitation with [Daughter] [was] suspended on September 28, 2011, due to safety concerns regarding the aggressive behaviors demonstrated by [Mother]. [Mother] was advised that in order to resume visitation with [Daughter], she must resume mental health services.

[Mother] chose not to resume mental health services and did not have contact with [Daughter] from July 18, 2011 until February 10, 2012. Per [Mother's] testimony before this Court, she does not recall having the visit with [Daughter] on February 10, 2012.

ii. [Mother] has a history of mental health issues and was given the diagnosis of bipolar disorder in November 2010. Her doctor recommended that [Mother] attend treatment and take prescribed medications. On November 30, 2010, [Mother] was admitted to Research Psychiatric Center. On December 6, 2010, Dr. Philip Khoury, M.D., Research Psychiatric Center informed the Missouri Department of Social Services, Children's Division, Platte County Office that [Mother] was demonstrating signs of severe psychosis and significant

risk exists for the safety of [Daughter] if she were living with [Mother] On December 6, 2010, [Daughter] was placed in protective custody.

[Mother] has failed to be monitored by a psychiatrist and comply with the recommendations made regarding psychiatric needs, including medication monitoring as ordered by the Court on May 11, 2011; August 31, 2011; November 23, 2011 and March 14, 2012. [Mother's] testimony indicates she did not see a psychiatrist from March 8, 2011 to March 20, 2012. Records indicate on March 20, 2012, [Mother] met with Shawn Willson, psychiatrist, one time. From March 20, 2012 until May 1, 2012, [Mother] was not under the care of a psychiatrist.

[Mother] has a consistent pattern of ignoring the medical advice of her mental health providers prior to the filing of the petition to terminate parental rights. Following the filing of the petition to terminate parental rights, and only three (3) weeks prior to the hearing on the petition,

[Mother] sought out psychiatric treatment from Dr. Christine Trueblood, psychiatrist.

iii. [Mother] has failed in individual therapy as ordered by the Court on August 31, 2011; November 23, 2011 and March 14, 2012. By [Mother's] own admission she did not participate in individual therapy from March 3, 2011 to December 21, 2011. Testimony and records indicate [Mother] attended seven (7) out of eleven (11) individual therapy sessions from December 21, 2011 to February 8, 2012 with Trish Beach, therapist from Creating Foundations. Records and testimony from Trish Beach, therapist, indicate that [Mother] demonstrated loss of time, disorganized thinking and disorganized behaviors during the therapy sessions. In Ms. Beach's progress update report dated March 1, 2012, Ms. Beach expressed concerns that [Mother's] behaviors would likely present a danger for [Daughter]. [Mother] did not see a therapist from February 8, 2012 until May 16, 2012.

iv. [Mother] has failed to follow the recommendations of her psychological evaluation as ordered by the Court on February 16, 2011. [Mother] completed a psychological evaluation with Synergy Services on March 23, 2011. Leslie N. Jones, Ph.D., recommended that [Mother] continue to participate in individual therapy; attend a parenting class and continue psychiatric care and medication management. [Mother] failed to consistently comply with the recommendations made by Dr. Jones.

v. [Mother] has failed to complete a parenting program as ordered by the Court on August 31, 2011; November 23, 2011, and March 14, 2012. Records and testimony indicate [Mother] was enrolled with Triality [Tots] in September 2010 while [Mother] was living in the home of her mother, [Grandmother]. [Grandmother] refused to allow services in her home so Triality [Tots] terminated their case after two visits. Services with Triality [Tots] resumed in March 2011. Records and testimony indicate [Mother] would forget appointments and be asleep when the parent aide would arrive. [Mother] was unsuccessfully discharged from Triality [Tots] on August 29, 2011, due to her extensive number of missed appointments and her lack of follow-through on services outside of appointments.

vii. [Mother] failed to immediately notify the Missouri Department of Social Services, Children's Division, Platte County Office, and the Juvenile Office of

any changes regarding household composition, employment status, address, living arrangements and telephone numbers within twenty-four (24) hours of the change as ordered by the Court. . . . By [Mother's] own admissions she failed to notify [said offices] of her whereabouts as she moved from friend to friend, to homeless shelters and in with family members.

[Trial court set out a lengthy timeline of Mother's whereabouts from December 2010 through April 11, 2012, representing sixteen moves.]

vii.   [Mother] has failed to fully cooperate with the Missouri Department of Social Services, Children's Division, and the Juvenile Office and any other service providers to the family as ordered by the Court on February 16, 2011; May 11, 2011; August 31, 2011; November 23, 2011 and March 14, 2012. Records and testimony indicate numerous community service referrals were provided to [Mother] before the filing of the petition to terminate parental rights that she was unwilling to access.

[List of referrals Mother received]

The trial court concluded:

The testimony and records received by this Court were undisputed in that [Mother] struggles to take care of herself and her own significant problems. Her extensive history and failure to establish stability, maintain employment and a consistent residence for herself and [Daughter] makes it unlikely that her home in the foreseeable future will be acceptable as a permanent placement for [Daughter]. [Mother] is unable to provide care appropriately for [Daughter's] ongoing physical, mental or emotional needs in the reasonable foreseeable future.

Any improvements that Mother has made in her life have largely occurred after the termination petition was filed. Mother's conduct after the filing of a termination petition cannot constitute the sole consideration of the court's decision. *In re N.M.J.*, 24 S.W.3d 771, 780 (Mo.App.2000). A court must look at the totality of a parent's conduct both prior to and after the filing of the termination petition. *Id.* "Otherwise, a parent can always argue that she [or he] has reformed since the filing of the petition, reformation usually occurring while the child is away." *In the Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App. 1996). For these reasons, a parent's conduct after the termination petition has been filed may not be compelling. *In re N.M.J.*, 24 S.W.3d at 780.

Due to [Mother's] behavior termination of parental rights is clearly and irrefutably necessary to ensure a safe and permanent home for [Daughter].

We wholly disagree with Mother's characterization of these findings as conclusory or insufficiently detailed. Mother claims that the trial court failed to identify what conditions of a potentially dangerous nature continue to exist or that the conditions indicated a likelihood of harm to [Daughter]. In light of the detailed findings above, this assertion is facially without merit. In the Judgment, the trial court explicitly found that Mother is unable to care for Daughter, a finding first made by the trial court when it assumed jurisdiction of Daughter on February 17, 2011. At that time, the trial court found that Mother's failure to obtain psychiatric treatment, her failure to take her prescribed medication, and her consistent pattern of ignoring advice from her mental health providers and the orders of the court created a basis for concern about her ability to care for Daughter. The Judgment's findings clearly indicate that the initial concerns about Mother's ability to

care for Daughter continued and persisted through the date of termination. The trial court found that as late as February 8, 2012, Mother was exhibiting behaviors that would likely present a present danger to [Daughter] including loss of time, disorganized thinking, and disorganized behaviors. Termination under section 211.447.5(3) is " 'based on a determination that conditions of a potentially harmful nature continued to exist as of the termination, rather than a mere finding that the conditions that led to the assumption of jurisdiction still persisted.' " *In re A.A.T.N.*, 181 S.W.3d 161, 167 (Mo.App. E.D.2005) (citation omitted).

■ Mother claims the trial court's findings are against the weight of the evidence. Mother claims there was no evidence that *at the time of the termination* of Mother's parental rights, Mother's housing, employment or mental health had a negative impact on Daughter or created a likelihood of future harm to the child, or that Daughter had any physical, mental or emotional need that Mother was unable to appropriately care for. We disagree.

As noted by the trial court in the Judgment, "[a] court must look at the totality of a parent's conduct both prior to and after the filing of the termination petition. 'Otherwise, a parent can always argue that she [or he] has reformed since the filing of the petition, reformation usually occurring while the child is away.' " *In the Interest of C.L.W.*, 115 S.W.3d 354, 358–59 (Mo.App. S.D.2003) (citations omitted). Thus, a parent's conduct after the termination petition has been filed may not be compelling. *Id.* at 359.

Here, Mother did not begin seeing a psychiatrist on a routine basis or taking her medication until after the filing of the petition to terminate her parental rights and shortly before trial. Her own psychiatrist, Dr. Trueblood, could not opine that Mother's circumstances would improve,

and observed that, at best, with six months of consistent services and care, she might be in a position to assess whether Mother could safely parent. The weight afforded by the trial court to Mother's evidence of her late in the game, new found willingness to comport with recommendations that she had previously (and on several occasions) was not an abuse of discretion. Based on the totality of Mother's behavior, the trial court's findings are supported by substantial evidence.

The trial court did not err in finding ground for termination under subsection 211.447.5(3). Points Six, Seven, and Eight are denied.

### Point XI—Section 211.447.7(1)-(5)—Best Interests Determination

■ For her ninth and final point, Mother argues that the trial court erred in finding that termination of her parental rights was in the best interests of Daughter because the trial court's findings are conclusory in nature and do not demonstrate that the court gave due consideration to the evidence presented in that the trial court failed to address evidence favorable to the preservation of the parent-child relationship, failed to support its findings with facts or inferences contained in the record, and instead merely recited the statutory language in finding such factors supported termination of parental rights. Notably, Mother's point relied on does not challenge the sufficiency of the evidence to support the trial court's best interests determination. Mother only contests whether the trial court's findings are sufficiently detailed as to permit this court to conclude that due consideration was given to all of the evidence.

Section 211.447.7 provides, in pertinent part:

When considering whether to terminate the parent-child relationship pursuant to

... subsection 5 of this section, the court shall evaluate and make finding on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within as ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child[.]

Here, the trial court concluded pursuant to section 211.447.7,[10] albeit in a summary fashion, that Daughter had little if any emotional ties to Mother, that Mother had not maintained regular visitation or contact with Daughter, that Mother had not provided for the cost of care and maintenance of Daughter though financially able to do so, that additional services would not likely bring about lasting parental adjustment, and that Mother had demonstrated a disinterest in or lack of commitment to Daughter. The trial court also expressly referenced and relied upon a social investigation and social study report prepared pursuant to section 211.455 in determining whether termination of Mother's parental rights was in Daughter's best interests.

Section 211.447.7 does not require specific findings with respect to each of its subparagraphs. *In re A.S.O.*, 52 S.W.3d 59, 67 (Mo.App. W.D.2001). "The court need only make findings on the prongs 'when appropriate and applicable to the case.'" *Id.;* Section 211.447.7. "Because the findings under this subsection of the statute are discretionary, '[t]he scope of appellate review is limited to an abuse· of that discretion.'" *Id.* (citation omitted). "A ruling will be reversed for abuse of discretion only when it is so 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004) (citations omitted).

Mother relies on *In re K.C.M.* 85 S.W.3d 682, 696, 698 (Mo.App. W.D.2002), abrogated on other grounds by *In re M.D.R.*, 124 S.W.3d 469 (Mo. banc 2004), to argue that the trial court's finds were not sufficiently detailed. However, in that case, this court held similar findings to be minimally sufficient. *K.C.M.* 85 S.W.3d at 696 (citing *In re A.S.O.*, 52 S.W.3d at 67–68 (trial court's findings were (1) the child is not bonded to the defendant; (2) The defendant has maintained contact with the child but has missed some visits and left some visits early; (3) The defendant has been unable to contribute payment for the care and maintenance; (4) No additional services would be likely to bring about lasting parental adjustment enabling the return of the child to the parent within an ascertainable period of time; and (5) The defendant does show interest in the child.)) We are compelled to similarly conclude that the trial court's findings in this case are sufficient, particularly as all of the evidence supporting the findings was me-

---

**10.** The Judgment reflects that the trial court employed a clear, cogent, and convincing standard to assess the evidence of Daughter's best interests, though the trial court was only required to employ a preponderance of the evidence standard. *See In re P.L.O.*, 131 S.W.3d at 789.

ticulously detailed in connection with the trial court's findings in support of grounds for termination. Mother offers no authority to explain how requiring a trial court to repeat findings made earlier in a Judgment that are of clear relevance to later findings about a child's best interests would serve any practical purpose.

Additionally, Mother complains that the trial court's findings fail to expressly address evidence favorable to her position. Mother fails to cite any authority to support her contention that express findings rejecting evidence favorable to a parent must be included in a judgment terminating parental rights. Though Mother claims that *In re K.C.M.* stands for this proposition, she is mistaken. In *In re K.C.M*, the mother argued only that the trial court's findings were not supported by the record and did not argue that there was evidence favorable to her position that the trial court's findings failed to expressly address. *In re K.C.M*, 85 S.W.3d at 696 (in addition to her conclusory argument, Mother also argued that the finding was contrary to the evidence in the record). "[A]n appellant must cite legal authority to support his points relied on if the point is one in which precedent is appropriate or available; if no authority is available, an explanation should be made for the absence of citations. Failure to cite relevant authority supporting the point or to explain the failure to do so preserves nothing for review." *In re Marriage of Fritz*, 243 S.W.3d 484, 488 (Mo.App. E.D.2007).

The trial court did not abuse its discretion in finding that termination of Mother's parental rights is in Daughter's best interests. Point Nine is denied.

### Appointed Counsel for Mother's Motion for Award of Attorney's Fees on Appeal

While this appeal was pending, Mother's appointed counsel filed a motion seeking attorney's fees for work performed on appeal. The motion was taken with the case.

Per *In re A.D.G.*, 23 S.W.3d 717, 720–21 (Mo.App. W.D.2000), section 211.462.4 allows an award of attorney fees for the court-appointed representatives for the child and parents in termination of parental rights cases as "court costs." However, it is the more appropriate province of the ***trial court*** to determine whether and in what amount fees should be awarded to court-appointed counsel, even when the fees sought are for services on appeal. *Id.* at 721 (emphasis added); *In re C.W.*, 257 S.W.3d 155, 157 (Mo.App. E.D.2008). Thus, we remand this case to the trial court so that it can consider and rule on the pending motion for an award of attorney's fees for services provided in representing Mother on this appeal. *Id.; see also In re A.M.S.*, 272 S.W.3d 305, 311 (Mo.App. W.D.2008).

### Conclusion

The judgment of the trial court terminating Mother's parental rights to Daughter is affirmed. This case is remanded to with instructions for the trial court to consider and rule on Mother's counsel's pending motion for an award of attorney's fees.

All concur.